In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-1714

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CARL GORDON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 334—**Ronald A. Guzman**, *Judge.*

ARGUED NOVEMBER 30, 2007—DECIDED JANUARY 16, 2008

Before BAUER, RIPPLE, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendant-Appellant Carl
Gordon is a citizen of Belize who lawfully entered the
United States in 1974. Gordon obtained permanent
resident status and was issued a "green card." Ten years
later, Gordon committed a series of home invasion robber-
ies, targeting elderly women alone in their homes. In
March of 1985, a Cook County grand jury indicted
Gordon on multiple charges, including home invasion,
residential burglary, armed robbery, robbery, aggravated
battery, and theft. Gordon was found guilty of several of
these charges and was sentenced to concurrent ten and
seven year terms in the custody of the Illinois Department
of Corrections. On January 3, 1990, Gordon was deported

based on those convictions. Before he was deported, an immigration judge explained to Gordon that he no longer was a legal permanent resident and provided him with an I-294 form, which explained that he needed permission from the Attorney General to return to the United States.

Gordon returned to the United States in November of 1995 without obtaining permission from the Attorney General. The exact date of Gordon's return is uncertain, but on appeal, Gordon asserts that it was sometime during November of 1995. Gordon reentered via Mexico at the San Ysidro, California border checkpoint. At that checkpoint, Gordon presented his green card—which was still in his possession despite his deportation—to the Immigration and Customs Enforcement agent and was allowed to reenter the United States.

On October 12, 2000, Gordon was again arrested on charges of home invasion and armed robbery of an elderly woman. On August 8, 2001, he was convicted of these crimes in Illinois state court and sentenced to twelve years' imprisonment. On August 10, 2001, Gordon entered the custody of the Illinois Department of Corrections to begin serving his sentence. Standard custodial procedures should have alerted the government to Gordon's unlawful presence at this time, but standard procedures, for some unknown reason, were not followed in this case.

On April 21, 2006, Gordon was interviewed by an Immigration and Customs Enforcement agent, and he admitted to the agent that he had illegally reentered the United States by presenting his authentic but invalid green card to the inspector at the border. With this green card, Gordon falsely represented that he was a lawful permanent resident of the United States.

On May 9, 2006, Gordon was indicted on charges of being a deported alien illegally present and found in the

United States without the express consent of the Attorney General, in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(2). This offense has a five-year statute of limitations period from the time the offense is complete. On June 27, 2006, Gordon moved to dismiss the indictment arguing that the prosecution was time-barred. Gordon argued that the government had constructive knowledge of his illegal presence in the United States as of the moment he crossed the border at San Ysidro and, through the exercise of due diligence, the government should have discovered his crime. Although charged with being "present and found" in the United States, Gordon asserted that this offense was not a continuing one in light of his entry through an official port of entry and the use of his real name, date of birth, and alien identification number, and thus his reentry was not surreptitious. Therefore, Gordon argued, his offense was complete for statute of limitations purposes at the time of his successful reentry. Gordon also claims that he did not know his reentry was illegal because the I-294 form that he received upon his removal was confusing and he thought he was allowed to return after five years.

The government responded that Gordon's reentry was surreptitious because the presentation of an invalid green card concealed the illegality of his presence from the border authorities exercising normal diligence. And, because his reentry was surreptitious, the government argued, the statute of limitations did not begin to run until the government "actually discovered" Gordon's illegal presence in the United States. The government pointed out that requiring the border authorities to do a background check on everyone seeking to cross the border, even when they present an authentic immigration document, places an unreasonable burden on border personnel. Gordon responded that the border authorities have computers at their stations for precisely that reason, and

insisted that background checks on everyone crossing the border is not too burdensome.

On August 3, 2006, the district court denied Gordon's motion, finding that the government could not be expected to run a background check on every person requesting permission to enter the United States, especially when he or she presents authentic immigration documents. The court held that the government did not have actual or constructive knowledge of Gordon's illegal reentry at the time he crossed the border, and therefore the indictment was not time-barred. On November 14, 2006, Gordon entered a conditional guilty plea, preserving his right to appeal the district court's denial of his motion to dismiss the indictment.

At the sentencing hearing, the district court concluded that Gordon's offense level was twenty-one and his criminal history score was nine, which placed him in criminal history category four. This provided for an advisory guidelines range of fifty-seven to seventy-one months' imprisonment. The district court then heard arguments from both parties before sentencing Gordon.

Gordon argued for a sentence below the advisory guidelines range. He explained that when he was deported, he was told by immigration officials that he would be denied reentry for five years; after that, it was Gordon's understanding that he would be allowed to return by showing his green card to immigration officials. He claimed that his risk of recidivism and any threat he posed to the public in the future was significantly diminished because he would not return to the United States now that he knew he could not do so legally (without the permission of the Attorney General). In support of his arguments, Gordon presented a copy of the I-294 form that he says was the source of his sincere—albeit incorrect—belief that he could return to the United States

after five years. He also emphasized the fact that he reentered the United States at an official port of entry and used his real identity, which was evidence of his sincere misunderstanding of the restrictions on his reentry. He said that he did not know his green card was invalid, despite his deportation in 1990.

The government argued for a sentence of 120 months' imprisonment, asserting that the guidelines range was "woefully inadequate" because Gordon preyed on vulnerable and defenseless elderly women, and that Gordon's prior deportation for similar crimes had done nothing to deter him from returning and claiming another elderly victim. Moreover, the government contended that Gordon's criminal history score under-represented the seriousness of his criminal history, and urged the district court for an upward departure to 120 months on the basis that such a sentence was necessary to protect the public from Gordon. This argument was based on the fact that seven of Gordon's prior convictions had been consolidated for sentencing, which resulted in him receiving two fewer points for his criminal history score. The government requested the guidelines range of seventy to eight-seven months' imprisonment, which would have been the guidelines range had Gordon's prior convictions not been consolidated. The government further argued that it could not prevent Gordon from returning to the United States and continuing his "signature offense" on society's elderly women.

Gordon responded that his prior crimes had adequately been accounted for and that his criminal history score did not under-represent the magnitude of his criminal history. Gordon also contended that the government's requested 120 months sentence was arbitrary, as it was not linked to any specific guideline. In a final comment to the court, Gordon apologized for returning to the United States, and again stated that he would not return in the future.

The district court rejected Gordon's claim that he did not know that he could not return to the United States without permission and that his green card was no longer valid. The district judge believed that Gordon was being intentionally deceitful when he presented his green card to immigration officials at the border, as "logic and common sense" dictated that one's permanent resident status (which a green card represents) is revoked when one is deported. Acknowledging Gordon's extensive contacts with the United States and lack of contacts with his native Belize, the district judge also discredited Gordon's promise not to return to the United States again. Noting Gordon's criminal inclinations, the district judge said he was not persuaded that Gordon would not reenter the United States, despite now knowing it was a federal crime to do so.

At that point, Gordon requested a sentence of thirty months' imprisonment on the basis that the delay in his prosecution had deprived him of the opportunity for a concurrent sentence, and that the government's requested sentence of 120 months would result in a sentence four times the national average for illegal reentry sentences and approximately twice what his advisory guidelines range yielded. The district judge rejected Gordon's request. He reasoned that, after considering the Presentencing Report, the sentencing memoranda submitted by both parties, and the arguments raised, he was very concerned that Gordon had targeted society's most vulnerable citizens numerous times (even after deportation for the same types of crimes), had completely disregarded the laws of the United States, and was likely to return to the United States again and continue committing his signature offense. The district judge concluded that he "need[ed] to protect the public," and that the guidelines calculation under-represented the impact of Gordon's criminal history and the danger to the

community that he posed. The district judge sentenced Gordon to ninety-six months' imprisonment.

Gordon's first argument on appeal is that the district court erred when it held that the five-year statute of limitations for Gordon's illegal reentry offense was not triggered until Gordon was taken into custody by the Illinois Department of Corrections in 2001. Gordon contends that immigration officials had constructive knowledge of Gordon's illegal presence in the United States in November of 1995 and thus, the five-year statute of limitations for the crime of illegal reentry began to run at the time of his actual return to the United States. Shortly after the filing of Gordon's opening brief, this Court explicitly rejected Gordon's proposed constructive knowledge standard for statute of limitations purposes on illegal reentry crimes in *United States v. Are*, 498 F.3d 460 (7th Cir. 2007). As a result, Gordon argued in his reply brief that *Are* was wrongly decided and should be overturned.

We review *de novo* whether the limitations period has run, giving deference to necessary factual determinations by the district court. *United States v. Barnes*, 230 F.3d 311, 314 (7th Cir. 2000). We will not reject the district court's factual findings unless they are clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 365-66 (1991); *United States v. Greve*, 490 F.3d 566, 570 (7th Cir. 2007).

The statute of limitations for noncapital offenses provides that "no person shall be prosecuted, tried, or punished for any offense . . . unless the indictment is found . . . within five years next after such offense shall have been committed." 18 U.S.C. § 3282(a). Federal prosecution for illegal reentry, a noncapital offense, is subject to a five-year limitations period. *See United States v. Clarke*, 312 F.3d 1343, 1346 (11th Cir. 2002); *see generally Are*, 498 F.3d 460 (applying a five-year statute of limitations to a § 1326(a) violation). Generally, an offense is "committed"

when each element of the offense has occurred. *Toussie v. United States*, 397 U.S. 112, 115 (1970); *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999). The offense of illegal reentry pursuant to 8 U.S.C. § 1326(a)(2) is committed in any of three ways: when the deported alien (1) enters the United States; (2) attempts to enter the United States; or (3) is at any time found in the United States. *United States v. Herrero-Ordones*, 190 F.3d 504, 509 (7th Cir. 1999).

An alien commits the offense of being "found in" the United States if he enters via a surreptitious border crossing or "enters through a recognized port by means of specious documentation that conceals the illegality of his presence." *United States v. Acevedo*, 229 F.3d 350, 355 (2d Cir.) (internal quotations omitted), *cert. denied*, 531 U.S. 1027 (2000); *see United States v. Lopez-Flores*, 275 F.3d 661, 663 (7th Cir. 2001) (explaining that, in the case of surreptitious reentry, the "found in" offense is first committed at the time of reentry). A deportee who reenters the United States by presenting an invalid green card but uses his real name still deceives immigration officials as to the legality of his presence, and therefore enters surreptitiously. *Acevedo*, 229 F.3d at 355.

Gordon first contends that his entry was not surreptitious. We disagree. Gordon entered through a recognized port by means of an authentic but invalid green card that concealed the illegality of his return to the United States. Gordon also claims that he did not know that his green card was no longer valid despite having been deported. The district court found this assertion to be unbelievable. Absent clear error here, we accept the district court's conclusion that this assertion was not credible. *See Greve*, 490 F.3d at 570; *see also United States v. Jones*, 21 F.3d 165, 168 (7th Cir. 1994) ("It is well-established that the district court's factual findings and credibility deter-

minations are reviewed for clear error."). Accepting the district court's finding that Gordon knew that his green card was invalid, Gordon's presentation of that green card, combined with his non-disclosure of his prior deportation to the immigration officials at his reentry, does more than merely suggest that his reentry into the United States was surreptitious. Gordon sought to deceive immigration officials (and did so successfully) as to his legal status in this country upon his reentry in November of 1995.

Gordon argues that *Are* was wrongly decided, because unlike the other Courts of Appeal, this Court has taken the burden off of the government entirely by explicitly rejecting a constructive knowledge standard. Contrary to our sister circuits, we held in *Are* that when the government "should have discovered" a deportee's illegal presence in the United States is irrelevant to when the statute of limitations begins to run on the deportee's § 1326(a) offense. *Compare Are*, 498 F.3d at 466 (constructive knowledge is irrelevant to statute of limitations determination), *with United States v. Rivera-Ventura*, 72 F.3d 277, 281-82 (2d Cir. 1995) (the statute of limitations begins when "the authorities know, or with the exercise of diligence typical of law enforcement authorities, could have discovered the illegality of his presence"), *United States v. Lennon*, 372 F.3d 535, 541 (3d Cir. 2004) ("[I]llegal re-entry begins, for statute of limitations purposes, when the alien presents himself non-surreptitiously (i.e. using his own name) at an open point of entry even though immigration personnel failed to react."), *United States v. Santana-Castellano*, 74 F.3d 593, 598 (5th Cir. 1996) (statute of limitations starts when alien is "found," but barring circumstances that suggest that immigration officials should have known of deportee's presence earlier), *United States v. Gomez*, 38 F.3d 1031, 1037 (8th Cir. 1994) (statute of limitations begins when

immigration could have discovered the violation, using diligence typical of law enforcement authorities), *and Clarke*, 312 F.3d at 1347-48 (11th Cir.) (statute of limitations starts when federal government could have discovered through reasonable diligence that deportee was illegally present in the United States). Gordon asserts that under *Are*, the government is allowed to "ignore all signs of an alien's presence in the United States until it decide[s] it want[s] to prosecute him."

The flip-side of Gordon's argument, however, is that so long as an alien hides well for five years after giving the government a mere sniff of his presence, he cannot be prosecuted. While blatant flight from justice may toll the statute of limitations, we need not provide an incentive to illegal aliens to subtly fly under the government's radar. We believe this to be a compelling reason not to join our sister circuits on this issue. *See Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1364 (7th Cir. 1996) (reiterating the importance of *stare decisis*). Although Gordon makes some valid arguments challenging the reasoning of *Are*, we do not find them compelling enough to overrule Circuit precedent. Thus, we decline to reconsider or overturn *Are*.

In *Are*, this Court held that, for statute of limitations purposes, "[t]o be 'found in' the United States without permission after deportation means to be 'present in' the United States without permission after deportation; the immigration agency's 'discovery' of the alien (whether actual *or* constructive) is not an element of the offense.*"* 498 F.3d at 466 (emphasis in original). Being "found in" the United States at any time is a continuing offense. *Id.* at 464; *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 460-61 (7th Cir. 2006) (citing *United States v. Cores*, 356 U.S. 405, 408 (1958)). Hence, "a deportee who has reentered surreptitiously prolongs his illegal presence in

the United States each day he goes undetected." *Are*, 460 F.3d at 466 (citing *Rodriguez-Rodriguez*, 453 F.3d at 460). "The limitations clock does not run during this period because the deportee's crime continues; he remains illegally 'present in' the United States." *Id.* "[B]ecause the 'found in' version of § 1326(a)(2) is a continuing offense, the date on which the immigration agency 'should have discovered' the alien is simply irrelevant." *Id*. Under *Are*, the limitations period in an illegal reentry case begins to run, at the earliest, when the immigration authorities actually discover the illegal alien's presence, identity and status. *Id.* at 466-67. At the latest, it begins to run when the alien turns himself in or is arrested. *Id*.

Both the date of the government's actual discovery of Are's illegal presence in the United States, as well as his arrest for violating § 1326(a)(2) were within five years of the date of his indictment for that offense. *See Are*, 460 F.3d at 467. Therefore, the facts of the *Are* case did not require the Court to commit itself to a single operative date on which the statute of limitations clock began to run. In the case now before us, we again need not assign a single operative date. Because we find that Gordon's entry was surreptitious, the government necessarily did not have actual knowledge of his illegal status upon reentry in November of 1995. Gordon managed to fly under the government's radar until October 12, 2000, when he was arrested for yet another home invasion and armed robbery of an elderly woman. He was convicted on August 8, 2001, and entered the custody of the Illinois Department of Corrections on August 10, 2001. It was not until an April 21, 2006 interview of Gordon by an immigration agent that the government gained actual knowledge of Gordon's illegal presence. Because Gordon was already in custody, there was no date of arrest for his illegal reentry offense.

The government concedes that it would have gained knowledge of Gordon's illegal presence on August 10, 2001 had standard procedures been followed, and thereby accepts August 10, 2001 to be the operative date that triggered the statute of limitations. However, under *Are*, constructive knowledge is irrelevant. 498 F.3d at 466. Despite a failure to follow standard procedures that *would have* resulted in actual knowledge, the federal government did not have actual knowledge of Gordon's illegal presence until April 21, 2006. *See, e.g.*, *Clarke*, 312 F.3d at 1348 (state officials' knowledge of defendant's illegal presence cannot be imputed to federal immigration officials); *United States v. Mercedes*, 287 F.3d 47, 55 (2d Cir. 2002) (same). We point out, however, that even if we were to use the constructive knowledge date of August 10, 2001, Gordon's indictment would still be timely.

Under the standard set forth in *Are*, the only possible date from which the statute of limitations could begin to run is April 21, 2006, the date of the federal government's actual discovery of Gordon's illegal presence. Therefore, Gordon's May 9, 2006 indictment was timely, and the district court properly denied his motion to dismiss the indictment.

Gordon also argues on appeal that his sentence of ninety-six months' imprisonment was unreasonable. Gordon's 1990 removal was subsequent to an aggregated felony conviction, therefore Gordon was subject to the harsher criminal penalties of fines, imprisonment of not more than twenty years, or both. 8 U.S.C. § 1326(b)(2). Gordon points out that the sentence was twenty-five months above the high end of his advisory guidelines range, and argues that the district court failed to provide a sufficient explanation for the upward departure.

We review a sentence under an abuse of discretion standard, regardless of whether the sentence is inside or

outside of the Sentencing Guidelines range. *Gall v. United States*, 552 U.S. ___, 128 S.Ct. 586, 597 (2007). We begin by ensuring that the district court did not commit any significant procedural error, "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Id.* If we find the district court's sentencing decision to be procedurally sound, we then consider the substantive reasonableness of the sentence under an abuse of discretion standard. *Id.*

In sentences outside of the Guidelines range, we must consider the extent of the deviation from the Guidelines range, but we must also give due deference to the district court's determination that the § 3553(a) factors, when taken as a whole, justified the extent of the variance. *Gall*, 552 U.S. ___, 128 S.Ct. at 597. Variances from the Guidelines should be explained and supported with compelling justifications for such deviations. *United States v. Wachowiak*, 496 F.3d 747, 749-50 (7th Cir. 2007). The fact that we "might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 552 U.S. ___, 128 S.Ct. at 597. We acknowledge that: "The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Id.* at ___, 128 S.Ct. at 597 (internal quotation omitted). Because the district court has greater familiarity with the case and individual defendant, and because it has an "institutional advantage over appellate courts in making these sorts of determinations" (in light of their frequency), we defer,

absent an abuse of discretion, to its ruling. *Id.* (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)).

Gordon first argues that his sentence is unreasonable because it rests upon a clearly erroneous factual finding that Gordon knew it was illegal to return to the United States. Gordon contends that the district court did not credit any of Gordon's testimony or evidence, thereby ignoring a crucial mitigating factor. As noted above, absent clear error, we defer to the district court's determination regarding Gordon's lack of credibility on this point. Furthermore, the district court did in fact consider the evidence, namely, the I-294 form that Gordon presented as the alleged source of his confusion regarding the legality of his return, in its opinion regarding Gordon's motion to dismiss. Again, we find no problem with the factual conclusion that, when read in its entirety, the I-294 form made it clear to Gordon that he was not allowed to return to the United States without permission. At sentencing, the judge again stated his disbelief that, after going through deportation proceedings in which his permanent resident status was revoked, Gordon could have possibly believed his green card—a memorialization of permanent resident status—was somehow still valid.

Gordon also asserts that his sentence is unreasonable because the district judge failed to articulate anything unique or compelling about Gordon or his criminal history that would justify a sentence so high above the advisory guidelines range. We disagree. At the sentencing hearing, the district judge distinguished Gordon from the hundreds of thousands of other illegal aliens that enter the United States each day who come here to work and support their families. *See Koon*, 518 U.S. at 113 ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes

magnify, the crime and the punishment to ensue."). Instead, as the district judge noted, Gordon came here to commit crimes and take advantage of the most vulnerable people who cannot defend themselves. The district judge explained that it did not believe Gordon would not return to the United States, despite his promise not to, because his entire family is here, he has nothing in Belize, he has stated that he was miserable in Belize, and based on his prior actions, the illegality of his return to the United States is of no concern to him. The district judge was also convinced that Gordon would again prey on the vulnerable members of society and would use implied or actual violence. These considerations appropriately related to the nature, circumstances, and seriousness of the offenses and to the need for just punishment, adequate deterrence, and the protection of the public. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A)(C); *see also United States v. King*, 506 F.3d 532, 536-37 (7th Cir. 2007) (holding that a sentence thirty-four months above the top of defendant's advisory guidelines range was reasonable); *United States v. Walker*, 447 F.3d 999, 1008 (7th Cir. 2006) (holding that a sentence thirty months above the top of defendant's advisory guidelines range was reasonable). The district court's explanation was sufficient reasoning for the variance from the guidelines range; it was not required to explain each day, week, or month above the guidelines range it imposed. *See Wachowiak*, 496 F.3d at 750 (holding that, if "the sentence chosen is within the broad range of objectively reasonable sentences in the circumstances, the sentence will be affirmed."); *United States v. Vitrano*, 495 F.3d 387, 390-91 (7th Cir. 2007) (explaining that, post-*Booker*, the fact that a district court departs from the advisory guidelines is not the issue; the issue is whether the sentence imposed is reasonable). We therefore find that the district court did not abuse its discretion in

sentencing Gordon above his advisory guidelines range, and his sentence was reasonable.

For the foregoing reasons, we AFFIRM the district court's denial of Gordon's motion to dismiss and Gordon's sentence.

RIPPLE, *Circuit Judge*, concurring. I join the judgment of the court and that part of its opinion that holds that the imposed sentence is a reasonable one.

With respect to the statute of limitations issue, I agree that, if *United States v. Are*, 498 F.3d 460 (7th Cir. 2007), is the governing precedent, the timeliness issue in this case can be decided on its authority. As my colleagues note, however, *Are* set this circuit on a path different from all the other circuits that have addressed this issue. As far as I have been able to ascertain, it did so without affording the entire membership of the court an opportunity to participate in the decision-making process. *See* Circuit Rule 40(e). Consequently, I have a serious doubt as to whether *Are* is a viable precedent upon which to predicate today's decision.[1]

---

[1] The decision in *United States v. Are*, 498 U.S. 460 (7th Cir. 2007), relies in significant part on our previous decision in *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 461 (7th Cir. 2005) for the proposition that we ought not recognize constructive notice. *Rodriguez-Rodriguez* was not directly on point, but, to the extent that it can be said to have lighted the way for the panel in *Are*, I note that *Rodriguez-Rodriguez* also apparently

(continued...)

Despite these misgivings about the legitimacy of the precedent upon which it relies, I join in the judgment of the court because I do not believe that the Government can be charged with constructive notice when Mr. Gordon presented himself at the border with an invalid, although authentic, green card. Indeed, it seems to me that his actions at that point can be characterized as affirmatively misleading the Government. The Government should not be charged with constructive knowledge of this surreptitious entry, even though it occurred at an official border checkpoint.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

---

[1] (...continued)
was never circulated to the entire court under Circuit Rule 40(e), even though, according to the *Are* panel, it was establishing a conflict among the circuits and disapproving *dicta* in *United States v. Herrera-Ordones*, 190 F.3d 504 (7th Cir. 1999), that had assumed that the view of the other circuits was correct.