PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

FAUSTO URIBE-RIOS, a/k/a
Francisco Medina, a/k/a Efrain
Gomez Gonzalez, a/k/a Francisco
Uribe-Rios,

*Defendant-Appellant.*

No. 07-4803

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert J. Conrad, Jr., Chief District Judge.
(3:06-cr-00395-RJC)

Argued: October 30, 2008

Decided: March 4, 2009

Before GREGORY and DUNCAN, Circuit Judges, and
Richard D. BENNETT, United States District Judge for the
District of Maryland, sitting by designation.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Gregory and Judge Bennett concurred.

## COUNSEL

**ARGUED:** Ann Loraine Hester, FEDERAL DEFENDERS
OF WESTERN NORTH CAROLINA, INC., Charlotte, North

Carolina, for Appellant. Adam Christopher Morris, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Claire J. Rauscher, Executive Director, Steven Slawinski, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Gretchen C. F. Shappert, United States Attorney, Charlotte, North Carolina, for Appellee.

## OPINION

DUNCAN, Circuit Judge:

Appellant, Fausto Miguel Uribe-Rios, appeals his conviction and sentence under 8 U.S.C. § 1326 for being "found in" the United States without the permission of the Attorney General after having previously been deported for an aggravated felony. Appellant reentered the United States under an alias and was later arrested and convicted by North Carolina authorities for drug trafficking. Upon his release from state prison after a five-year sentence, Appellant was interviewed by federal immigration authorities. During that interview, Appellant revealed his real identity and unauthorized presence in the United States. Eight days later, Appellant was indicted under section 1326. Appellant moved to dismiss the indictment on statute of limitations, venue, and pre-indictment delay grounds. After the district court denied the motion, Appellant pleaded guilty and was sentenced. On appeal, Appellant raises the same arguments and also challenges his sentence on Fifth and Sixth Amendment grounds. For the reasons set forth below, we affirm.

### I.

Appellant Fausto Miguel Uribe-Rios, a citizen of Mexico, has been deported from the United States on at least five separate occasions in ten years, at least once after having been

convicted of an aggravated felony. He unlawfully reentered the United States in 1997 and was subsequently arrested by North Carolina law enforcement officials for drug trafficking in August 2000.

The record shows that Appellant used over thirty aliases during his time in the United States, including, but not limited to, "Francisco Rios Medina," "Francisco Uribe-Rios," "Efrain Gomez-Gonzalez," "Jose Antonio Bautista Cobos," "Victor Gomez-Gomez," "Adolfo Rios Medina," "Ruben Hureverios," and "Paco Gomez." J.A. 175. Following his arrest in 2000, he was prosecuted under the name "Francisco Rios Medina" in Wake County, which is located in the Eastern District of North Carolina. On January 26, 2001, following a trial in North Carolina state court, he was sentenced to six years in state prison.

Although Appellant was initially incarcerated in a facility located in the Eastern District of North Carolina, in December 2004 he was transferred to a different facility located in the Western District of North Carolina where he served the remainder of his state prison term. Before the transfer occurred, federal immigration authorities placed a detainer[1] on Appellant under the name "Francisco MEDINA-Rios." The detainer, dated May 28, 2004, advised North Carolina officials that an "[i]nvestigation ha[d] been initiated to determine whether this person is subject to removal from the United States." S.A. 1.[2]

Upon his release from state prison in the Western District

---

[1]A detainer is a mechanism by which federal immigration authorities may request that another law enforcement agency temporarily detain an alien "in order to permit assumption of custody by the Department [of Homeland Security]." *See* 8 C.F.R. § 287.7(d).

[2]References to "S.A." are to the Supplemental Appendix submitted by the parties. References to "J.A." are to the Joint Appendix submitted by the parties.

of North Carolina on September 21, 2006, Appellant was immediately taken into custody by the United States Bureau of Immigration and Customs Enforcement ("ICE"). In an interview with ICE agents conducted that same day, Appellant stated that his real name was Fausto Miguel Uribe-Rios, he had previously used the alias "Francisco Rios Medina," he had previously been deported, and he had not applied to the Attorney General for permission to reenter the United States. Appellant reiterated these statements in a sworn affidavit. J.A. 52-53. ICE agents processed Appellant's fingerprints at that time, discovering deportation orders and warrants under Appellant's true name, Fausto Miguel Uribe-Rios, as well as under the aliases "Francisco Uribe-Rios" and "Efrain Gomez-Gonzalez." It is undisputed that the federal government did not have actual knowledge of Appellant's presence in this country under his correct name until this time.

Appellant was indicted in the Western District of North Carolina on September 29, 2006, under 8 U.S.C. § 1326 for being "found in" the United States without the permission of the Attorney General after having previously been deported for an aggravated felony.[3] Section 1326 provides in pertinent part:

> (a) In general . . . any alien who—
>
> > (1) has been . . . removed or has departed the United States . . . and thereafter
> >
> > (2) enters, attempts to enter, or is at any time found in, the United States, unless . . . the Attorney General has expressly consented . . .

---

[3]The indictment refers specifically to "Sections 1326(a) and (b)(2)." J.A. 6.

shall be fined under Title 18, or imprisoned not more than 2 years, or both.

(b) Criminal penalties for reentry of certain removed aliens—Notwithstanding subsection (a) . . .

(2) [Any alien] whose removal was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such Title, imprisoned not more than 20 years, or both.

8 U.S.C. § 1326.

In the district court, Appellant moved to dismiss the indictment, arguing that the applicable statute of limitations had run, that venue was improper, and that he was prejudiced by pre-indictment delay. The district court rejected Appellant's arguments and denied the motions to dismiss the indictment. *United States v. Uribo-Rios*, No. 3:06cr395, 2006 WL 3751323, at *4 (W.D.N.C. Dec. 19, 2006).[4] Appellant pleaded guilty without entering a plea agreement and was sentenced to 70 months imprisonment with three years of supervised release.

Appellant timely appealed his conviction, raising the same statute of limitations, venue, and pre-indictment delay claims raised in the district court below. He also raised a new claim that his sentencing violated his rights under the Fifth and Sixth Amendments because he was sentenced based on past convictions that were neither admitted by him nor proven to a jury beyond a reasonable doubt.

---

[4]The different spelling of "Uribe-Rios" in the caption appears to be a clerical error in the slip opinion below.

II.

We have jurisdiction under 28 U.S.C. § 1291. Appellant's arguments turn on questions of law, which we review de novo. *United States v. Woolfolk*, 399 F.3d 590, 594 (4th Cir. 2005). We address Appellant's arguments in turn.

III.

The parties do not dispute that the applicable statute of limitations is five years.[5] Appellant argues that the statute of limitations began running on January 26, 2001, when he "entered the custody of the State of North Carolina." Appellant's Br. at 15. He contends that "[a]t that point, he had been 'found' by authorities as required to establish a violation of 8 U.S.C. § 1326." *Id.* He notes that at or by this date, he had given his name as "Miguel Uribe-Rios" in state court and had testified in that forum as to his illegal status in the United States. He further emphasizes that "he was in the exclusive control of government authorities" and had been fingerprinted. *Id.* at 15, 18.

To support his statute of limitations argument, Appellant relies heavily on *United States v. Gomez*, 38 F.3d 1031 (8th Cir. 1994), which concerned an illegal alien who had been deported under the alias "Rodrigo Rojas Gomez," but whose real name was "Javier Dario Gomez." When Gomez was deported as "Rodrigo Rojas Gomez," the INS file under that name contained a social security number and fingerprints. Gomez reentered the United States surreptitiously and presented himself at an INS Legalization Office to apply for temporary resident status. In the application, he provided his real name, his fingerprints, and the false social security number connected with the alias "Rodrigo Rojas Gomez." The INS

---

[5]*See* 18 U.S.C. § 3282(a) (catch-all limitations period for non-capital offenses); *see also United States v. Rivera-Ventura*, 72 F.3d 277, 280 (2d Cir. 1995) (applying 18 U.S.C. § 3282 to 8 U.S.C. § 1326).

granted him temporary resident alien status, which was later adjusted to permanent resident alien status. When Gomez was arrested several years later in connection with a jewelry theft, an FBI and INS fingerprint analysis revealed that Javier Dario Gomez and Rodrigo Rojas Gomez were the same person. Five years and four days after Gomez had initially presented himself to the INS Legalization Office, the INS filed an indictment charging Gomez with violating 8 U.S.C. § 1326. Under these circumstances, the *Gomez* court found that the five-year limitations period had expired by the time the indictment was filed, noting that federal immigration authorities had "possesse[d] all the necessary information [to determine Gomez's identity and illegal status], but negligently fail[ed] to act upon it for over five years." *Id.* at 1037. The *Gomez* court held that "the statute of limitations for a 'found in' violation should . . . begin running when immigration authorities could have, through the exercise of diligence typical of law enforcement authorities, discovered the violation." *Id.* at 1037.

In addition to *Gomez*, Appellant cites cases from the Second, Fifth, and Tenth Circuits for the proposition that "for an alien to be 'found,' the government must have 'knowledge of the illegality of his presence, through the exercise of diligence typical of law enforcement authorities.'" *United States v. Bencomo-Castillo*, 176 F.3d 1300, 1303 (10th Cir. 1999) (quoting *United States v. Santana-Castellano*, 74 F.3d 593, 598 (5th Cir. 1996); citing *Rivera-Ventura*, 72 F.3d at 282-82). Appellant argues that in his case, "had governmental authorities used reasonable diligence, they would have 'found'" him at the time he was incarcerated in state prison. Appellant's Br. at 18. He points out that "North Carolina correctional authorities had a system in place for notifying ICE officials of inmates believed to be in the country illegally." *Id.* He also emphasizes that the North Carolina Department of Corrections maintained a website that provided the name of "Francisco Rios Medina," a state identification number, and an FBI identification number. These state and FBI identification numbers appear on the FBI criminal history report for

"Fausto Uribe-Rios," which also includes a North Carolina conviction under the name "Francisco Rios Medina." J.A. 62-72. Appellant argues that "[i]mmigration authorities had access to [his] FBI and state identification numbers . . . and they could have run them through the FBI database at any time," which would have revealed Appellant's name, his alias of "Francisco Rios Medina," and his illegal immigration status. Appellant's Br. at 19. Appellant contends that ICE's failure to do so "does not demonstrate the level of diligence typical of law enforcement authorities" and that the limitations period began running on January 26, 2001, the date of his state incarceration. *Id.*

A.

Appellant's argument that the limitations period began running on January 26, 2001 is unpersuasive for several reasons. At the outset, we note that Appellant cites no evidence in the record showing that on January 26, 2001, federal immigration authorities were aware of his identity and illegal presence in the United States. As Appellant correctly points out, courts interpreting section 1326 have held that "a previously deported alien is 'found in' the United States when his physical presence is discovered and noted by the immigration authorities." *United States v. Reyes-Nava*, 169 F.3d 278, 280 (5th Cir. 1999) (quotations and citations omitted); *see also United States v. Almendarez*, 1 F. App'x 234, 234 (4th Cir. 2001) (unpublished) ("[O]ther courts have held that an alien is 'found' when immigration authorities discover his presence in the United States, determine that his presence is illegal, and ascertain that he has reentered after a previous deportation." (citations omitted)). Appellant provides no evidence showing that on January 26, 2001, *federal* immigration authorities were aware of his actual identity, his presence in the United States, or his illegal immigration status. He can only show that *state* authorities were aware of his presence—under an alias—and he points to no cases in which courts have held that an alien is "found in" the United States in violation of

section 1326 when state, rather than federal officials, take the alien into custody. In fact, courts have uniformly declined to find that state officials' knowledge of an alien's illegal presence in the United States may be imputed to federal immigration authorities to trigger the limitations period. *See, e.g.*, *United States v. Clarke*, 312 F.3d 1343, 1347 (11th Cir. 2002) (collecting cases and holding that "[t]o the extent that [the alien] contends that the knowledge of Florida police can be imputed to the INS and therefore is sufficient to start the running of the five-year statute of limitations, we reject this argument").

Contrary to Appellant's argument that when he was incarcerated by state officials he was in the custody of "governmental" authorities and therefore "found" under section 1326, courts have routinely held that an alien is "found in" the United States only when *federal*, not state, immigration officials become aware of the alien's presence and illegal status. In *United States v. Santana-Castellano*, 74 F.3d 593 (5th Cir. 1996), an alien reentered the United States illegally and was eventually arrested and convicted in Texas state court for the offense of injury to a child. While serving his five-year state sentence, an INS agent interviewed him. The Fifth Circuit held that the alien was "found in" the United States on the date the INS agent interviewed him, and not when the alien was arrested and convicted by state law enforcement authorities. "[I]n instances where the deported alien surreptitiously enters the country, and is later discovered by the INS, the statute of limitations does not begin to run until his presence as well as the illegal status of that presence *is discovered by the INS*." 74 F.3d at 598 (citations omitted) (emphasis added). Similarly, in *United States v. Mercedes*, 287 F.3d 47 (2d Cir. 2002), an alien illegally reentered the United States in 1991 and was arrested by the New York City Police Department on a state homicide charge in 1993. While he was awaiting his sentencing, the INS first learned of his presence in the United States in 1996 when they interviewed him at a state correctional facility. The Second Circuit rejected the alien's conten-

tion that the INS could have discovered his illegal presence in the country after his 1993 arrest, when state authorities took his fingerprints and generated a rap sheet on him. The *Mercedes* court noted that "if any authority was on notice of [the alien's] illegal presence in the United States in 1993, it was the New York State Department of Corrections, not the INS." *Id.* at 55. The court refused "to adopt a rule that would make the INS responsible for any immigration-related information discovered in *state* investigations of the hundreds of thousands of prisoners in state custody at any given time." *Id.* Because Appellant points to no evidence showing that federal immigration authorities were aware of his identity and illegal presence in the United States when he was incarcerated in state prison on January 26, 2001, we reject his argument that on that date "he had been 'found' by authorities as required to establish a violation of 8 U.S.C. § 1326." Appellant's Br. at 15.

## B.

Appellant also relies on *Gomez* and a theory of constructive knowledge to support his statute of limitations argument. His arguments are unavailing in this case for several reasons.

## 1.

First, we note that the plain text of section 1326 does not support a theory of constructive knowledge. An alien violates 8 U.S.C. § 1326 when the alien "is at any time found in[ ] the United States"—not when the alien is "found or should have been found" in the country, as Appellant argues. The Seventh Circuit has already rejected a theory of constructive knowledge under section 1326, finding that "when the government 'should have discovered' a deportee's illegal presence in the United States is irrelevant to when the statute of limitations begins to run." *United States v. Gordon*, 513 F.3d 659, 664-65 (7th Cir. 2008) (citations omitted). The *Gordon* court reasoned that "to be 'found in' the United States . . . means to

be 'present in' the United States without permission after deportation; the immigration agency's 'discovery' of the alien (whether actual *or* constructive) is not an element of the offense." *Id.* at 664-65. Because the alien "remains illegally 'present in' the United States," the *Gordon* court interpreted the "found in" violation of section 1326 to be a continuing offense, such that "[t]he limitations clock does not run during this period." *Id.* at 665 (citation and quotation marks omitted). "Because the 'found in' version of § 1326(a)(2) is a continuing offense, the date on which the immigration agency 'should have discovered' the alien is simply irrelevant." *Id.* (citation and quotation marks omitted). Like the *Gordon* court, we are reluctant to read a gloss onto section 1326 that the text of the statute does not itself support.

2.

Second, even if section 1326 does countenance a theory of constructive knowledge, we conclude, consistently with other circuit courts, that such a theory does not benefit Appellant. Notably, Appellant cites *no* case in which a court has found that federal immigration authorities had constructive knowledge of an alien's illegal presence in the United States when the alien concealed his identity through the use of an alias. Although the theory of constructive knowledge imposes upon federal immigration officials a duty to exercise "diligence typical of law enforcement authorities" in ascertaining an alien's immigration status, *see United States v. Bencomo-Castillo*, 176 F.3d 1300 (10th Cir. 1999), courts have declined to apply such a theory to find that federal immigration officials failed to act with the requisite diligence when the alien has affirmatively concealed his true identity with an alias.

In *Bencomo-Castillo*, for example, the Tenth Circuit acknowledged the availability of a constructive knowledge theory under section 1326, but nevertheless affirmed the district court's determination that federal immigration authorities had "found" an alien only when "an INS agent identified him

as a previously deported alien," and not at an earlier point when state police arrested him, took his fingerprints, and submitted them to the FBI. 176 F.3d at 1303. The court noted that federal immigration officials "cannot discover information about an alien giving a false name unless they check multiple computer indexes," and that "if the alien uses a new alias, the [indexes] will not yield any information about him." *Id.* at 1304. Under these circumstances, the court refused to find that federal immigration officials had constructive knowledge of the alien's illegal presence in the United States when state officials submitted his fingerprints to the FBI. *See id.* at 1304 (declining to impose on immigration officials a "legal duty under § 1326 to conduct a more exhaustive investigation of [an alien's] criminal history" when the alien has used an alias to conceal his identity). Likewise, in *United States v. Mercedes*, the Second Circuit refused to apply a constructive knowledge theory to find that federal immigration officials had constructively found an alien when the alien was arrested by state law enforcement officials, three years before an immigration agent interviewed him at a state correctional facility and actually ascertained his illegal status. 287 F.3d at 55. The *Mercedes* court emphasized that the alien had given a false name when he was arrested and that the rap sheet that state law enforcement officials generated upon his arrest contained at least 11 other aliases. The court found it "hardly unreasonable to expect that the 'rap' sheet's listing of multiple false names, as well as different birthdates and places of birth, would delay INS officials" in ascertaining the alien's illegal status in the United States. *Id.* In addition, the court noted that "it is difficult not to find [the alien's] claim regarding the delay disingenuous when he was the one who attempted to deceive law enforcement officials by concealing his true identity." *Id.* The First Circuit echoed this observation in *United States v. DeLeon*, 444 F.3d 41 (1st Cir. 2006):

> [F]or statute of limitations purposes in § 1326 prosecutions, there can be no finding of lack of diligence where it is deception by the alien as to his identity

that has caused the government not to have knowledge of his presence. To hold otherwise would be to reward deceit by the alien and to encourage the withholding of information, and so the corruption of the deportation process.

*Id.* at 52. Like our sister circuits, we decline to employ a theory of constructive knowledge to find that federal immigration officials in this case failed to act with "diligence typical of law enforcement authorities" when Appellant concealed his identity with an alias.

3.

Moreover, Appellant cites no case in which a court has found that federal immigration authorities had constructive knowledge of an alien's illegal presence in the United States when the alien was in the custody of state, rather than federal, law enforcement officials. As noted above, courts have uniformly declined to find that state officials' knowledge of an alien's illegal presence in the United States may be imputed to federal immigration authorities for purposes of determining when the limitations period begins to run. Although Appellant relies heavily on *Gomez* to support his constructive knowledge argument, this reliance is misplaced. In *Gomez*, the alien presented himself to *federal* immigration authorities and provided his real name and fingerprints. As the *Gomez* court noted, "[b]ecause the INS had in its possession Gomez's fingerprints [under both his alias and his real name], and had access to the FBI facilities for fingerprint comparison, it possessed both the information and the means necessary to determine Gomez's status as a deported alien." 38 F.3d at 1037. In this case, however, although both North Carolina and federal authorities had Appellant's fingerprints, the two sets of fingerprints were associated with different aliases. Appellant

stresses that he testified in state court as to his illegal immigration status, but even then he failed to give his full real name.[6]

There is no evidence in the record to show that, as in *Gomez*, federal immigration authorities had "both the information and the means necessary" to ascertain Appellant's illegal presence in the United States. 38 F.3d at 1037 Although Appellant asserts that "North Carolina correctional authorities had a system in place for notifying ICE officials of inmates believed to be in the country illegally," Appellant's Br. at 18, the record does not show that North Carolina law enforcement actually followed such practice in this case, and the district court found that such notification of ICE officials had not in fact occurred. Appellant also emphasizes that the North Carolina Department of Corrections maintained a website that provided the name of "Francisco Rios Medina," as well as state and FBI identification numbers, which federal immigration officials could have cross-checked against the FBI criminal history report for "Fausto Uribe-Rios." Appellant points out that the FBI report for "Fausto Uribe-Rios" contained the same state and FBI identification numbers that were linked to "Francisco Rios Medina" in the North Carolina on-line database. These assertions do not help Appellant, however, because both the North Carolina on-line profile for "Francisco Rios Medina" and the FBI report for "Fausto Uribe-Rios" bear dates from 2006. Even if federal immigration officials were able to determine that these two names referred to the same individual, there is no evidence in the record to show that the information contained in either document was available on January 26, 2001, the date Appellant was incarcerated in state

---

[6]Notably, the court transcript refers to both "Francisco Medina [Miguel Uribe-Rios]" and "Miguel Uribe Rios/a.k.a. Francisco Medina." J.A. 135G, 135I. Although Appellant asserts that he had "given his correct name of Miguel Uribe-Rios in open court and had testified under oath" as to his illegal immigration status and deportability, Appellant's Br. at 15, the record shows that the prosecution addressed him as "Mr. Medina," J.A. 135I.

prison and when Appellant contends the limitations period began to run.

Appellant has failed to show evidence of facts that would support a finding of constructive knowledge as articulated by our sister circuits. Regardless of whether section 1326 countenances a constructive knowledge theory, such a theory is unavailable to Appellant because of his own malfeasance in using an alias and because fundamental principles of dual sovereignty do not allow us to impute the knowledge of state officials to federal officials. Indeed, Appellant urges us to adopt a theory of constructive knowledge unsupported by either the statutory text or case law. We decline to find a lack of diligence "where it is deception by the alien as to his identity that has caused the government not to have knowledge of his presence." *DeLeon*, 444 F.3d at 52. Likewise, we decline to adopt a rule that would make federal immigration authorities "responsible for any immigration-related information discovered in *state* investigations of the hundreds of thousands of prisoners in state custody at any given time." *Mercedes*, 287 F.3d at 55. We decline to adopt a theory of constructive knowledge on these facts and reject Appellant's argument that ICE's failure to monitor and cross-check state law enforcement records against federal law enforcement records to discover his true identity amounts to a failure to exercise diligence typical of law enforcement authorities.

Because Appellant has not shown that federal immigration officials discovered his illegal presence in the United States and ascertained that he had reentered after a previous deportation on January 26, 2001, his statute of limitations argument fails.

## IV.

Appellant next argues that venue was improper in the Western District of North Carolina because he was "found" in the Eastern District of North Carolina before his involuntary

transfer to the Western District of North Carolina in December 2004. Title 8 U.S.C. § 1329 states that a prosecution for a violation of section 1326 "may be instituted at any place in the United States at which the violation may occur." Courts have interpreted this provision as placing venue for a section 1326 offense in any district where an alien is "found." *See United States v. Almendarez*, 1 F. App'x 234, 235 (4th Cir. 2001) (unpublished) (citing *United States v. Herrera-Ordones*, 190 F.3d 504, 511 (7th Cir. 1999)); *see also United States v. Hernandez*, 189 F.3d 785 (9th Cir. 1999).

Appellant argues that he "should have been 'found,' at the latest, when federal immigration authorities placed a detainer on him" on June 7, 2004—before state officials transferred him to another state institutional facility in the Western District of North Carolina. Appellant's Br. at 22. He cites *United States v. Hernandez-Hernandez*, 291 F. Supp. 2d 490 (W.D. Tex. 2003), for the proposition that "if a defendant has been 'found' by immigration authorities in one district, he cannot then be transferred to another district only to be 'apprehended' by federal authorities in the other district." Appellant's Br. at 21. The *Hernandez-Hernandez* court held that federal immigration authorities had found the defendant when they placed a detainer on him. 291 F. Supp. 2d at 496.

*Hernandez-Hernandez* is inapposite to this case. There is no indication that the alien in that case concealed his identity from state and federal law enforcement authorities by using an alias. Nor is there any indication that immigration authorities were not aware of the alien's identity and immigration status when the detainer was issued. In contrast, the record here shows, at most, that federal immigration authorities had requested a detainer on someone named "Francisco MEDINA-Rios" and that an "[i]nvestigation ha[d] been initiated to determine whether this person [was] subject to removal from the United States." S.A. 1. Appellant points to nothing in the record to show that when they placed a detainer on Francisco Medina-Rios, federal immigration authorities

had actual knowledge of either his real identity or immigration status, let alone both.

Although Appellant makes much of the fact that he was involuntarily present in the Western District when he was found, this argument does not alter our venue analysis. As noted above, section 1329 places venue for a section 1326 violation in any district where the alien is found, with no regard as to whether the alien is in that district voluntarily. The Seventh Circuit has expressed a similar view in *Herrera-Ordones*, holding that "whether an alien was in a particular location by choice has no relevance in venue determinations" because "[v]enue is proper anywhere in the United States, wherever the previously deported and reentered alien is 'found.'" 190 F.3d at 511. *Cf. United States v. Ortiz-Villegas*, 49 F.3d 1435, 1437-38 (9th Cir. 1995) (finding that "[i]ntent to be in the United States at the moment [an alien] is located is not necessary" because that alien already "has the intent required to support a conviction for being 'found in' the United States" by voluntarily reentering the country). Because federal immigration authorities found Appellant under section 1326 in the Western District of North Carolina, venue was proper in that district.

## V.

Appellant also argues that the five years between his state incarceration in 2001 and his federal immigration prosecution in 2006 amounted to an unconstitutionally prejudicial pre-indictment delay. He argues that the delay violated his Fifth Amendment right to due process because it cost him the chance to serve part of his federal and state sentence concurrently.

In *United States v. Marion*, 404 U.S. 307 (1971), the Supreme Court explained that the Fifth Amendment "would require dismissal of the indictment if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice

to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." 404 U.S. at 324. We conduct a two-pronged inquiry to evaluate a defendant's claim that pre-indictment delay violated his right to due process. *United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 403 (4th Cir. 1985). First, we ask whether the defendant has satisfied his burden of proving "actual prejudice." *Id.* Second, if that threshold requirement is met, we consider the government's reasons for the delay, "balancing the prejudice to the defendant with the Government's justification for delay." *Id.* at 404 (citation omitted). The "basic inquiry then becomes whether the Government's action in prosecuting after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.'" *Id.* (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977). If delay results from a protracted investigation that was nevertheless conducted in good faith, the Supreme Court has held that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Lovasco*, 431 U.S. at 796.

Appellant's Fifth Amendment due process argument is unavailing because he has failed to establish that pre-indictment delay resulted in the unavailability of any records, witnesses, or other evidence.[7] Instead, his sole argument on appeal is that pre-indictment delay cost him the chance to serve his federal and state sentences concurrently.

We reject this argument for several reasons. First, because there is no right to serve state and federal sentences concurrently, an appellant's lost chance of doing so cannot be used to establish prejudice for the purposes of challenging pre-

---

[7]The district court found, and Appellant has not contested, that Appellant admitted he was "unsure" whether immigration records had been lost and could not identify any witnesses who were no longer available to testify.

indictment delay. *United States v. Ferguson*, No. 94-5326, 1995 WL 107358, at *3 (4th Cir. Mar. 15, 1995) (unpublished) (citing *United States v. Fuzer*, 18 F.3d 517, 520 (7th Cir. 1994) (focusing on the speculative nature of a potential award of concurrent sentences)). Apart from his inability to serve his sentences concurrently, Appellant cites no other source or cause of actual prejudice.

Second, we note that the opportunity to serve concurrent sentences does not implicate Appellant's Fifth Amendment right to a fair *trial. See United States v. Ricketson*, 498 F.2d 367, 370-71 (7th Cir. 1974); *United States v. Fromal*, 725 F. Supp. 856, 858 (E.D. Pa. 1989).[8] Appellant has not shown that the government purposely caused delay "to gain tactical advantage over" him at trial. *Marion*, 404 U.S. at 324.

Because Appellant failed to meet his burden of proving that pre-indictment delay actually prejudiced his right to a fair trial, his Fifth Amendment claim fails.

## VI.

Finally, Appellant challenges his sentence, arguing that the district court's consideration of prior convictions, evidence of which was neither alleged in the indictment nor proven to a jury beyond a reasonable doubt, violated his rights under the Fifth and Sixth Amendments. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior con-

---

[8]*Smith v. Hooey*, 393 U.S. 374 (1969), is not to the contrary. Although the *Smith* Court based a finding of prejudicial delay in part on the lost possibility of receiving partially concurrent sentences, the Court was applying the Sixth Amendment right to a speedy trial, not the Fifth Amendment right to a fair trial. *See id.* at 378. The Sixth Amendment right to a speedy trial right does not attach until indictment or arrest. *Jones v. Angelone*, 94 F.3d 900, 906 n.6 (4th Cir. 1996). Although Appellant has cited authority interpreting the Speedy Trial Act, Appellant's Br. at 22, we do not understand Appellant to be challenging the three-month time period between his indictment and conviction.

viction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

Appellant concedes that his claim falls within *Apprendi*'s express exception regarding evidence of prior convictions and acknowledges our recent reiteration that "the 'fact of a prior conviction' remains a valid enhancement even when not found by the jury." *United States v. Thompson*, 421 F.3d 278, 282 (4th Cir. 2005). But even without a prior convictions exception, Appellant's *Apprendi* claim would fail because Appellant was sentenced below the statutory maximum for the offense to which he pleaded guilty.[9] To the extent that Appellant's prior convictions factored into his sentence, they did not increase his sentence over the statutory maximum. *Apprendi* is inapposite, and there was no constitutional error in the district court's sentencing.

## VII.

For the foregoing reasons, the opinion below is

*AFFIRMED*.

---

[9]Appellant pleaded guilty to illegal reentry under 8 U.S.C. § 1326(a) and (b)(2). The statutory maximum term of imprisonment for that offense is 20 years. 8 U.S.C. § 1326(b)(2). Appellant was sentenced to 70 months imprisonment.