**UNITED STATES of America,**

v.

**Juan Adalverto VEGA–PENA, Defendant.**

**Criminal No. 2:09cr40.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 5, 2009.

Darryl Mitchell, United States Attorney's Office, Norfolk, VA, for Plaintiff.

Richard Colgan, Federal Public Defender, Norfolk, VA, for Defendant.

### OPINION AND ORDER

JEROME B. FRIEDMAN, District Judge.

This matter is before the court on defendant Juan Adalverto Vega–Pena's ("Vega–

Pena") motion to dismiss the criminal indictment pending against him on the ground that it is barred by the statute of limitations. On November 2, 2009, the court conducted a hearing at which both parties introduced documentary evidence and were afforded an opportunity to argue their respective positions. Additionally, the court heard testimony from a former special agent with the United States Immigration Service regarding the interpretation of the documents in Vega–Pena's immigration file. For the reasons set forth below, Vega–Pena's motion to dismiss the indictment is **GRANTED.**

### I. Factual and Procedural Background

The facts of this case are largely undisputed. Defendant, a Salvadoran national, was apprehended in December of 1988 while attempting to illegally cross the Mexican border into the United States. The United States Immigration and Naturalization Service ("INS")[1] assigned defendant an Alien Registration Number ("A-number") and he was deported to El Salvador in January of 1989. Defendant illegally reentered the United States in 1992 and timely filed a petition for asylum in that same year. On April 25, 2001, defendant submitted an INS application for Temporary Protected Status ("TPS").[2] (Def. Ex. 8.) In addition to his 2001 TPS application, defendant's immigration file contains a more recent TPS application, submitted in March of 2005. (Govt. Ex. A.) The second TPS application indicates that it was "DENIED" on August 21,

---

**1.** During the period relevant to the instant motion, the United States Immigration and Naturalization Service was dismantled and separated into three divisions within the Department of Homeland Security, including United States Customs and Immigration Services (USCIS). For consistency, this opinion refers to both the former INS and all components of the reorganized agency as "INS" as the majority of the documents at issue predate the agency's reorganization.

**2.** Neither the government nor the defendant offered evidence documenting the resolution of the defendant's asylum petition or the legality of his status from 1992–2001. Such matter is therefore not before the court.

2006. Following such denial, INS deemed Vega–Pena to be "in an unauthorized period of stay in the United States" and he was reported to the INS "Fugitive Operations Division" in December of 2006 as an "absconder." (Govt. Ex. E.) Defendant was arrested on November 15, 2008, by the City of Norfolk Police Department and federal immigration officials were thereafter contacted. Two days after his arrest, INS issued a "Notice of Intent/Decision to Reinstate Prior Order" of deportation. (Govt. Ex. D.)

Vega–Pena is charged in a single count indictment, filed on March 19, 2009, with "Reentry of a Deported Alien," in violation of Title 8, United States Code § 1326(a). The parties agree that the applicable limitations period is five years, but dispute when the limitations period began running. *See United States v. Uribe–Rios*, 558 F.3d 347, 351 n. 5 (4th Cir.2009) (recognizing the applicability of the 5–year "catch-all" limitations period set forth in 18 U.S.C. § 3282(a) to a charge of reentry of a deported alien). The issue before the court is whether, prior to March 19, 2004,[3] federal immigration officials were aware of defendant's presence in the United States, his identity, and his status as an alien that was previously deported.

## II. Analysis

### A. Interpretation of 8 U.S.C. § 1326

The offense charged in the indictment makes it a felony for an alien, after having been deported or removed from the United States, to enter, attempt to enter or "at any time [be] found in, the United States" unless the defendant has first obtained permission to re-enter the country. 8 U.S.C. § 1326(a). In interpreting such statute, this court is guided by the Fourth Circuit's recent opinion in *Uribe–Rios*, where the Fourth Circuit addressed a similar limitations challenge to a § 1326 charge, albeit on much different facts. The Fourth Circuit's opinion implicitly adopts the rule that because the "found in" offense set forth in § 1326(a) is a "continuing offense," the limitations period does not begin to run until an alien is "found." *Uribe–Rios*, 558 F.3d at 354. In considering precisely when an alien is deemed "found," the *Uribe–Rios* opinion establishes the following:

■ First, as universally held by federal courts addressing the question, state officials' knowledge regarding an alien's "actual identity, his presence in the United States, or his illegal immigration status" will not be imputed to *federal* immigration officials. *Id.* at 353. An alien will therefore be deemed to have been "found in" the United States "only when *federal*, not state, immigration officials become aware of the alien's presence and illegal status." *Id.*[4]

Second, the Fourth Circuit appears to reject a theory of constructive knowledge regarding facts that INS officials could have, or should have, discovered through diligent investigation. To clarify, several circuits have held that the limitations period starts running when federal immigration officials, through reasonable diligence, could have or should have discovered an alien's identity/illegal status. *See, e.g., United States v. Gomez*, 38 F.3d 1031,

---

**3.** As the defendant was indicted on March 19, 2009 and a five year limitations period applies, the timeliness of the indictment turns on whether the limitations period began running prior to March 19, 2004.

**4.** The defendant's argument in *Uribe–Rios* was that the indictment was untimely because

he was in the exclusive control of "government authorities" who discovered his true identity more than five years before the indictment was issued. *Uribe–Rios*, 558 F.3d at 354. However, it was the state of North Carolina, not the INS, that discovered the defendant's true identity more than five years before the indictment was filed.

1037 (8th Cir.1994) (finding that the limitations clock started running when INS had in its possession two sets of the defendant alien's fingerprints, one under his real name and one under his alias, because INS had "both the information and the means necessary" to determine the defendant's unlawful status through an FBI fingerprint check). In purportedly rejecting such a theory of "constructive knowledge," the *Uribe–Rios* opinion indicates that the plain text of § 1326 does not support such a reading and that, consistent with the Seventh Circuit, the Fourth Circuit is "reluctant to read a gloss onto section 1326 that the text of the statute does not itself support." *Uribe–Rios*, 558 F.3d at 354.

Third, although the Fourth Circuit plainly views the constructive knowledge theory with disfavor, a careful reading of the *Uribe–Rios* opinion reveals that such a theory is not rejected outright by the Fourth Circuit. Tellingly, after purportedly rejecting such a theory, the Fourth Circuit immediately notes: "[E]ven if section 1326 does countenance a theory of constructive knowledge, we conclude, consistently with other circuit courts, that such a theory does not benefit Appellant" based on the facts of the case. *Id.* The opinion then utilizes two and half pages to explain why, *on the facts before the court,* federal immigration officials did not have constructive knowledge of the defendant's status as an illegal alien, in part due to the defendant's use of over thirty aliases. *See id.* at 356 (quoting *United States v. De-Leon,* 444 F.3d 41, 52 (1st Cir.2006)) ("We decline to find a lack of diligence 'where it is deception by the alien as to his identity that has caused the government not to have knowledge of his presence.'"). Tellingly, the *Uribe–Rios* opinion concludes its analysis on this issue by stating: "We decline to adopt a theory of constructive knowledge *on these facts* and reject Appellant's argument that [INS's] failure to monitor and cross-check state law enforcement records against federal law enforcement records to discover his true identity amounts to a failure to exercise diligence typical of law enforcement authorities." *Id.* (emphasis added).

**B. Federal Immigration Officials had Actual Knowledge of Vega–Pena's Presence, Identity, and Illegal Status**

■ Although the *Uribe–Rios* opinion appears to leave the door open for a constructive knowledge theory on the proper set of facts, here, the court need not make a determination whether the instant case presents such set of facts because the evidence before the court establishes that *federal* immigration officials had *actual knowledge* of Vega–Pena's presence, true identity, and status as an illegal reentrant, more than five years prior to the issuance of the indictment. Numerous records contained in defendant's federal immigration file, along with the live testimony explaining such records, establish that the facts of this case differ widely from the facts of *Uribe–Rios,* where through the use of numerous aliases, including at least seven distinct first names, the defendant prevented federal immigration officials from recognizing his true identity until immediately before the indictment was issued. *See id.* at 350 ("It is undisputed that the federal government did not have actual knowledge of Appellant's presence in this country under his correct name until" the week the indictment was issued when the defendant reported his true name to INS and INS processed his fingerprints, thereby discovering prior deportation orders).

First, although defendant Vega–Pena technically had aliases as he did not report his last name in the identical form on every immigration document that he submitted, and his middle name is at times spelled "Adalverto" and at other times "Adalberto," his immigration file, taken as

a whole, suggests that Vega–Pena did not attempt to deceive immigration officials regarding his true identity.[5] With respect to the different names provided, most notably, defendant was deported in 1989 under the name "Juan Adalverto Vega–Pena" and his 1992 application for asylum states his name as "Juan Adalberto Vega." As established through testimony at the hearing, aliens often rearrange their names or use fictitious names to avoid detection of their true identities. However, the fact that an alien from El Salvador provided a non-hyphenated last name listing only his paternal family name (Vega), as opposed to a hyphenated last name including both paternal and maternal family names (Vega–Pena), is not necessarily proof of an intent to deceive. Here, the fact that defendant honestly reported his mother's true last name (Pena) on the same application that he listed his last name as "Vega" further supports the inference that defendant was not intending to conceal his true identity. (Def. Ex. 2.) This case is therefore distinguishable from *Uribe–Rios* where the defendant used numerous distinct first and last names, totaling over thirty separate aliases, to avoid discovery of his true identity.

Second, even if Vega–Pena intended to conceal his true identity from immigration officials in 1992, Defendant's 2001 application for TPS reported his true and full name: "Juan Adalverto Vega Pena." (Def. Ex. 8.) This name, reported to *federal* immigration officials in 2001, is identical to the name under which defendant was deported in 1989. Accordingly, unlike in *Uribe–Rios* where the issue was whether federal officials were imputed with state officials' knowledge of the defendant's true identity, here, federal immigration officials were aware of defendant's full name and true identity in 2001 when his submitted his TPS application.[6]

Third, federal immigration officials were actually aware of Vega–Pena's prior deportation as early as 2001. The former INS special agent testified at the hearing on this matter that in conjunction with a TPS application, INS form "I–821," an applicant is required to submit fingerprints which are checked against the FBI fingerprint database. Unlike the facts in several

5. Although a review of the exhibits, as well as the testimony at the hearing, suggest that defendant did not intentionally conceal his identity, he did fail to report his prior deportation to INS and on some forms affirmatively indicated that he had not previously been in the United States or previously been under immigration proceedings. (*See, e.g.,* Def. Ex. 8.) It should be noted, however, that defendant did, as early as 1992 and unquestionably by 2003, report that his most recent entry into the United States was illegal. (Def. Ex. 19.)

6. Defendant's immigration file indicates that he was on TPS for a six month period in 2002, and at the hearing the court inquired as to whether defendant was on TPS for a longer time as well as the legal impact that such status may have on the limitations period. That is, the court asked both parties whether TPS made defendant's presence in this country "lawful" such that the limitations period would either not start, or be tolled, while

defendant was on TPS. *See Okpa v. INS,* 266 F.3d 313, 315 (4th Cir.2001) ("TPS allows an alien to remain in the United States legally...."); *United States v. Orellana,* 405 F.3d 360, 370 (5th Cir.2005) (addressing legality of an alien's presence in the United States for the purposes of the firearm statute and distinguishing an alien that had been granted TPS (not unlawfully present) from an alien that merely applied for TPS (unlawfully present)). Notwithstanding the court's inquiry, the evidence presented to the court failed to establish that Vega–Pena was on TPS for longer than six months in 2002. Furthermore, the government failed to pursue the argument that this court should adopt a rule that the limitations period for § 1326 should either not start, or be tolled, while a defendant is on TPS as such designation is a form of lawful status. Accordingly, the limitations period applicable to this case runs, uninterrupted, from the date Vega–Pena was "found" by INS.

published cases addressing the extent of INS's constructive knowledge when it had *the means* to request such a fingerprint check, here the INS *actually requested* and received the results of such a check. Page one of Defendant's Exhibit 13 is an INS tracking system report, dated September 25, 2001, indicating that the "Date Processed by FBI" was September 21, 2001. (Def. Ex. 13.) Page two is a Department of Justice/INS "Official Rap Sheet Cover Sheet" listing defendant's full and accurate name ("Juan Adalverto Vega–Pena"), his FBI number, and the "Reason Fingerprinted (Form Number): I–821." (*Id.*) Page three through five is the FBI "Rap Sheet Printout" which similarly indicates a request date of September 21, 2001, lists the same FBI number as the cover sheet, and lists the defendant's full and accurate name. (*Id.*) Page four of the exhibit lists the following key information: (1) that Vega–Pena was arrested on 12/23 (no year provided) by "USINS" in Laredo;[7] (2) that the INS case number was "A29321838"; (3) that the charge was deportation; and (4) that on January 13, 1989, Vega–Pena was "Deported to El Salvador." (Def. Ex. 13.) Although the final piece of information listed above appears, by itself, sufficient to establish that INS was aware of the defendant's true identity and status as an illegal re-entrant in 2001, the other facts further confirm INS's knowledge as Vega–Pena's 1989 warrant of deportation states: (1) that Vega–Pena illegally entered the United States on or about December 22, 1988; (2) that such entry occurred "at or near Laredo, Texas"; (3) that the case number was "A29321838"; and (4) that defendant was deported to El Salvador on January 13, 1989. (Def. Ex. 1.) As INS actually possessed such knowledge in 2001, the constructive knowledge

analysis discussed in *Uribe–Rios* is simply not applicable in this case.

Fourth, even if the documents discussed above failed to establish that defendant was "found" by federal immigration officials in 2001, testimony and exhibits establish that he was "found" by INS in 2003. The former INS special agent testified at the hearing that when INS discovers that the same individual has multiple A-numbers, it is INS's practice to consolidate the file and use, going forward, the earliest A-number. Defendant's exhibit 18 is an INS letter to Vega–Pena regarding his employment authorization application, dated March 5, 2003, and it lists as his "A-file Number: A29321838." Such number is the same number under which defendant was originally deported. Accordingly, even if in 2001 INS did not make the connection between the "Vega–Pena" applying for TPS, and the "Vega–Pena" that was previously deported, it is clear that INS actually made such connection no later than March of 2003 since INS used the deportation A-number as the reference number for defendant's case. Furthermore, an additional INS report contained in Vega–Pena's immigration file, dated January 6, 2003, lists Vega–Pena's original A-file number: A29321838, and testimony established that the notation: "COA: DEP" on such form indicates that the reason the immigration file was originally created was because of a deportation. Accordingly, defendant was "found" by federal immigration officials no later than March of 2003.

In summary, it is readily apparent that the instant facts differ markedly from the facts in *Uribe–Rios*. Here, the court need not determine whether, "on these facts," constructive knowledge is sufficient to es-

---

**7.** The copy of the FBI report before the court is partially obscured due to what appears to

be a defect occurring during copying.

tablish the date that defendant was "found" in the United States because the INS had *actual* knowledge of Vega–Pena's true identity and status as an illegal re-entrant either in 2001, or 2003, both more than five years prior to the issuance of the indictment. In reaching such conclusion, the court rejects the government's argument that the limitations clock should not start running because Vega–Pena both failed to report his original "A-number" to INS and made misstatements on his INS applications regarding his name, criminal history, and prior deportation. Regardless of whether defendant attempted to deceive INS through such misstatements, it simply did not work, and once INS actually discovered defendant's true identity and presence in the United States as an illegal re-entrant, he was "found" for purposes of § 1326 and the limitations clock started running. *See United States v. Gunera,* 479 F.3d 373, 376–77 (5th Cir.2007) (finding that the alien's failure to report "information regarding his prior deportation, criminal history, and A-number [on] his TPS application is *not relevant* because the INS had in fact found that missing information as of September 28, 1999 when the [immigration system] inquiry was run") (emphasis added).[8] Here, like in *Gunera,* the court finds distinguishable the cases where "immigration authorities could not have known of the illegality of the alien's presence because the alien gave a false name or omitted other key information" that concealed his identity, *id.,* because Vega–Pena's identity was not successfully concealed beyond either 2001, or 2003, both of which are more than five years before the indictment was issued.

### III. Conclusion

As set forth in detail above, the facts before the court establish that federal immigration officials had actual knowledge of the defendant's presence, true identity, and status as an illegal re-entrant more than five years before the issuance of the indictment charging a violation of § 1326. In reaching such conclusion, the court need not "impute" any knowledge on INS agents, or hold them to a standard to "act diligently" to discover any facts, because the exhibits, as elucidated through testimony, establish that *federal* immigration officials actually possessed the requisite knowledge. Accordingly, defendant's motion to dismiss the Indictment is **GRANTED.**

The Clerk is **REQUESTED** to mail copies of this order to counsel for both parties.

**It is so ORDERED.**

---

**8.** It is immaterial whether the Fifth Circuit applies a different test then the Fourth Circuit regarding "constructive knowledge" as this court's finding turns on INS's *actual* knowledge, not constructive knowledge. For the same reason, it is immaterial that the *Uribe–Rios* opinion cited the Eighth Circuit's "all necessary information and means" test with disfavor since, here, the court's finding turns not on the fact that INS *could have* obtained a fingerprint comparison, but instead on the fact that INS *actually did obtain* a fingerprint comparison and the results revealed both defendant's true identity and status as an illegal re-entrant.