# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-4786

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ALBERTO RODRIGUEZ-RODRIGUEZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 05-CR-113-S-01—**John C. Shabaz**, *Judge.*

ARGUED MAY 11, 2006—DECIDED JULY 6, 2006

Before POSNER, EASTERBROOK, and WOOD, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Following his removal from
the United States, Alberto Rodriguez-Rodriguez returned by
stealth. State police stopped him in Texas for speeding. A
warrant check revealed that he was wanted in Wisconsin,
where he had failed to register as a sex offender following
his release from a state sentence, and he was extradited to
that state. Wisconsin alerted federal immigration officials
to his presence. A federal grand jury indicted Rodriguez-
Rodriguez under 8 U.S.C. §1326(a)(2), which makes it a
crime for any alien who has been removed from the United
States to enter, attempt to enter, or "at any time [be] found
in" this country, unless the Attorney General has given pre-
entry approval, which Rodriguez-Rodriguez neither sought

nor received. The district court accepted his conditional guilty plea, see Fed. R. Crim. P. 11(a)(2), and sentenced him to 48 months' imprisonment.

The issue reserved by the conditional plea is whether venue is proper in the Western District of Wisconsin. Rodriguez-Rodriguez maintains that he was "found" in the Southern District of Texas, where state police caught him speeding, rather than the Western District of Wisconsin, where he was handed over to the federal government. Although he acknowledges that federal immigration officials were ignorant of his presence in this country until he reached Wisconsin, he maintains that they *should* have discovered his violation of §1326(a) by establishing a program of information interchange with state officials, who knew (from the documents he provided when stopped for speeding) that he is a Mexican national. (He does not contend that the national government could require state officials to assist them, see *Printz v. United States*, 521 U.S. 898 (1997), but assumes that they would cooperate voluntarily if asked.) Unlike the alien in *United States v. Herrera-Ordones*, 190 F.3d 504 (7th Cir. 1999), who used aliases and false Social Security numbers to postpone detection, Rodriguez-Rodriguez did not try to deceive his captors. Thus he maintains that venue lies in Texas—where, he is convinced, he would have received a lower sentence under a "fast track" plea-and-sentence program adopted to cope with the flux of criminal prosecutions at the border.

Rodriguez-Rodriguez's argument depends on the proposition that an alien may be "found" in only one district, which supplies the exclusive venue. That may have been an assumption of the panel in *Herrera-Ordones*, but assumptions are not holdings. See, e.g., *Zenith Radio Corp. v. United States*, 437 U.S. 443, 462 (1978). Neither §1326 nor 8 U.S.C. §1329 (which governs venue for immigration crimes) states or implies that an alien may be "found" just

once. Section 1329 says that a prosecution may be brought "at any place in the United States at which the violation may occur or at which the person charged with a violation under [8 U.S.C. §1325 or §1326] may be apprehended." Far from specifying a one-unique-district approach, this statute contemplates multiple lawful venues: "any place . . . at which the violation may occur" *or* wherever the alien is "apprehended." Everything thus depends on §1326: Rodriguez-Rodriguez cannot prevail unless §1326 itself limits to one the number of districts in which the crime may be committed.

Federal officials apprehended Rodriguez-Rodriguez in Wisconsin—and his violation occurred there too, at least in normal English usage. The point of using a word such as "found" in §1326(a)(2) is to avoid any need to prove where and when the alien entered; the offense follows the alien. Just as it makes perfect sense to say that "the lousewort is found in all 50 states," so it makes sense—if it is not an inevitable reading of the statute—to say that an alien is "found" wherever he is. So if Rodriguez-Rodriguez had been handed over to immigration officials in Texas, had been released on recognizance and fled to Wisconsin, he could be "found" a second time there; venue would lie in either district. See *United States v. Ruelas-Arreguin*, 219 F.3d 1056, 1061 (9th Cir. 2000).

Rodriguez-Rodriguez assumes that the crime occurs only at the instant of its detection, so that "being found" is equivalent to "being arrested". *Ruelas-Arreguin* may have shared that assumption, though the court did not explain why. The statutory language suggests to us, however, a usage along the lines of our lousewort example: the alien commits the offense wherever he goes. The crime is *being* in the United States and is not limited to the instant at which a federal agent lays hands on the person and a light bulb in the agent's head illuminates the mental sign "This guy's an illegal alien."

Treatment of the "found" component of §1326(a)(2) as a continuing offense is a logical consequence of its language. The Supreme Court held in *United States v. Cores*, 356 U.S. 405 (1958), that a statute making it unlawful for a seaman to be "present" in the United States more than 29 days allowed by the crew's conditional landing permit creates a continuing offense; the Court contrasted this with the clause of §1326 that forbids unlawful "entry" by a previously deported alien. An "entry" is complete when it occurs, the Court stated, 356 U.S. at 408 n.6, while illegal "presence" is ongoing. The "found" clause in §1326 has the same structure and function as the "presence" clause that the Court considered in *Cores*. If presence in the United States is a continuing offense, then being found in the United States "at any time" must be a continuing offense too.

Many decisions (several of them cited in *Herrera-Ordones*) assume or hold that an alien can be "found" just once for purposes of the statute of limitations. Once an alien has been placed in federal custody, these decisions conclude, the five-year clock for prosecution continues ticking even if the alien is released, lost in a bureaucratic shuffle, and relocated a decade later in some other state. E.g., *United States v. Rivera-Ventura*, 72 F.3d 277 (2d Cir. 1995); *United States v. DiSantillo*, 615 F.2d 128 (3d Cir. 1980); *United States v. Gomez*, 38 F.3d 1031, 1038 (8th Cir. 1994). We need not decide whether this conclusion is correct; Rodriguez-Rodriguez was prosecuted within the statute of limitations by any measure. At all events a "one clock" rule does not imply that there is also only one possible district of prosecution—that if federal immigration officials take custody of an alien in Arizona (starting the clock), after which he skips bond and is recaptured in New Mexico, it is impossible to begin or continue the prosecution in the latter state. What sense could that make of the statutory text?

Rodriguez-Rodriguez does not cite, and we could not locate, any appellate decision concluding (after an ad-

versarial presentation) that an alien may be "found" for venue purposes in only one district, let alone that an alien must be *deemed* "found" (and venue be fixed) in a place where he was not reduced to custody by a federal agent. The possibility that a peripatetic alien may be exposed to prosecution in more than one district has been held proper in several cases, of which *Ruelas-Arreguin* is just one example, and is a commonplace for criminal statutes. In drug cases, for example, prosecution is proper in any district through (or over) which the defendant carries the illegal drugs. See, e.g., *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987). Dozens of similar cases are collected and discussed in Charles Alan Wright, 2 *Federal Practice and Procedure: Criminal* §303 (3d ed. 2000). Just so with an alien whose entry makes *himself* a form of contraband: the offense occurs wherever he is, and in every district through which he passes.

The actual *holding* of *Herrera-Ordones* is that "whether an alien was in a particular location by choice has no relevance in venue determinations. Venue is proper anywhere in the United States, wherever the previously deported and reentered alien is 'found.'" 190 F.3d at 511. Herrera-Ordones was arrested in northern Indiana and transferred by state officials, for their own convenience, to southern Indiana; we concluded that he could be prosecuted in the Southern District of Indiana. *Herrera-Ordones* establishes that, when an alien frustrates earlier discovery of his identity and status, he is "found" and may be prosecuted when federal agents at last stumble upon him in state prison; it does not hold (nor could it hold) that *only when* earlier discovery was impossible does actual discovery of an alien in state prison permit prosecution there. We now hold that venue may be laid wherever the alien is located in fact, and as often as he is located, whether or not better coordination and diligence would have alerted federal officials to his presence and status earlier and elsewhere. There is no

"right to be arrested" at a time most convenient to the defense. See *Hoffa v. United States*, 385 U.S. 293, 309-10 (1966); *Mireles v. Gonzales*, 433 F.3d 965, 969 (7th Cir. 2006).

According to Rodriguez-Rodriguez, this view allows prosecutors to manipulate venue to aliens' detriment. Agents could wait until the alien wanders into a district known for harsh sentences—or, worse, they could carry the alien into that district themselves and prosecute him there. If our reading of §1326 and §1329 gives prosecutors leeway that could be misused, that would be nothing new. Prosecutors often have wide choice of venue. In drug cases, for example, prosecutors may choose the crime's location by deciding where undercover agents offer to buy or sell drugs from suspects, or from what districts they place phone calls that set up transactions. We have rejected all arguments that use of these options is forbidden— provided only that the activity falls short of entrapment, and Rodriguez-Rodriguez does not contend that he was entrapped into committing the §1326 offense.

In particular we have criticized Judge Friendly's celebrated (though never followed) holding in *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), that federal agents must not maneuver a state crime into federal court by adding an interstate element such as a phone call or trip to a second state. *United States v. Podolsky*, 798 F.2d 177 (7th Cir. 1986), holds that *Archer* has no force unless the agents' acts amount to entrapment—and if entrapment *does* occur, the *Archer* principle is unnecessary for the defendant's protection. A rule against "venue manipulation" might be subsumed in the *Archer* principle, but having rejected in *Podolsky* the full scope of *Archer* we must for consistency add that agents may influence where the federal crime occurs, and thus where venue lies, as well as whether the crime comes under federal rather than state law. The entrapment doctrine protects the defendant against manu-

factured offenses (unless the defendant is predisposed); it does not limit venue. Accord, *United States v. al-Talib*, 55 F.3d 923, 929 (4th Cir. 1995) ("There is no such thing as [a rule against] 'manufactured venue' or 'venue entrapment.'").

All of the defendant's legitimate interests are fully protected by Fed. R. Crim. P. 21(b), which permits judges to transfer prosecutions "in the interest of justice". Rodriguez-Rodriguez asked for a transfer to Texas under this rule, but the district judge did not abuse his discretion in denying the motion. The crime was committed in Wisconsin every bit as much as in Texas, and his presence in Wisconsin was attributable to his violation of state law in Wisconsin rather than an attempt by the federal prosecutor to obtain a strategic advantage. As for convenience of proof: the absence of permission to return would have been established (had Rodriguez-Rodriguez stood trial) by a search of files at the Department of Justice in Washington D.C., and scattered offices of the Department of Homeland Security. Wisconsin was a sensible place for prosecution, because Rodriguez-Rodriguez was in custody there already.

One final subject. Rodriguez-Rodriguez contends that he should have received in Wisconsin the same reduced sentence that would have been available had he pleaded guilty in a district with a "fast track" program. Two recent decisions reject that argument: *United States v. Martinez-Martinez*, 442 F.3d 539 (7th Cir. 2006), holds that a sentence in a district without a fast-track program *need* not be reduced, and *United States v. Galicia-Cardenas*, 443 F.3d 553 (7th Cir. 2006), adds that it *must* not be reduced. Congress authorized fast-track programs in a few district courts not for the benefit of defendants (so that they can re-enter the United States illegally all the sooner) but to help prosecutors and judges reduce the queue of pending cases. Each defendant who pleads guilty in such a program receives a lower sentence; speedy disposition frees up prosecutorial time and judicial resources to achieve more

convictions, augmenting deterrence. Reducing the sentence of a defendant in a district such as Wisconsin, which does not need to offer inducements in order to make room for additional prosecutions, would sacrifice both deterrence and desert for no good reason.

AFFIRMED

A true Copy:

        Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*