In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-2802

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

ADEWUNMI ARE,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 708—**James B. Moran**, *Judge.*

---

ARGUED NOVEMBER 1, 2006—DECIDED AUGUST 9, 2007

---

Before KANNE, EVANS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* The sole issue in this appeal is the timeliness of an indictment for the crime of being "found in" the United States after deportation. *See* 8 U.S.C. § 1326(a)(2). Adewunmi Are, a Nigerian national, was convicted in 1995 of drug smuggling and in 1996 was deported. He attempted an illegal reentry in May 1998 but was caught at the airport and immediately sent back to Nigeria. He tried again in September 1998 and this time succeeded. Because he slipped into the country undetected, however, immigration authorities did not discover his presence until sometime after his 2003 arrest by Chicago police on an unrelated offense. Although he gave a false name at the time of his arrest and immedi-

ately posted bail, fingerprint processing and further investigation eventually confirmed his true identity and location, and in June 2005 he was arrested on the immigration violation.

The crime of illegal reentry under 8 U.S.C. § 1326(a)(2) is committed when a previously deported, removed, or excluded alien "enters, attempts to enter, or is at any time found in, the United States" without the Attorney General's permission. On September 1, 2005, Are was indicted for committing the "found in" version of this offense. Applying the five-year limitations period imposed by 18 U.S.C. § 3282(a), the district court dismissed the indictment as untimely.

The court held the government should have known of Are's illegal presence in 1998 or 1999 because immigration authorities had opened an investigative file in October 1998 based on Are's unsuccessful reentry attempt earlier that year; the authorities also had a tip from a confidential informant that Are was living in Chicago. This established constructive knowledge of Are's illegal presence, the court held, and that was enough to start the running of the statute of limitations. The judge believed the government should have investigated more diligently. The government appealed, arguing that only actual—not constructive—discovery by immigration authorities starts the running of the limitations period.

We reverse. The "found in" variation of the § 1326(a)(2) crime is a continuing offense; the statute of limitations generally does not begin to run for continuing offenses until the illegal conduct is terminated. The statute makes it a crime to be "*at any time* found in" the United States following deportation, permitting prosecution of deportees who evade detection at the border and remain present here undetected, even for long periods of time. A "constructive knowledge" interpretation—one that starts the statute of

limitations clock when the government "should have found" the deportee—is inconsistent with the straightforward text and obvious purpose of the statute. Immigration authorities did not actually discover Are's presence, identity, and status as a prior deportee until sometime in late 2003 or 2004, and his illegal presence continued until his arrest in June 2005. Whether measured from the date of his actual "discovery" by immigration authorities or the date of his arrest, the September 1, 2005 indictment was timely.

## I. Background

The former Immigration and Naturalization Service ("INS") deported Are to his native Nigeria in 1996 following his conviction for conspiracy to import heroin in the United States District Court for the Eastern District of New York. Are tried to reenter the United States at New York's Kennedy Airport on May 9, 1998, but was detained by immigration authorities and removed to Nigeria the next day. On September 4, 1998, however, he slipped into the United States by stealth. He moved in with his wife in Chicago under an assumed name and remained undetected by immigration authorities until sometime in late 2003 or 2004, when fingerprints taken during his September 23, 2003 arrest by Chicago police betrayed his presence to the Department of Homeland Security ("DHS"), the successor agency to the INS. On December 10, 2004, a Deputy United States Marshal completed a report that traced Are to an address in the Chicago suburbs; he was arrested on June 20, 2005. On September 1, 2005, a grand jury indicted him for the offense of being "found in" the United States after his 1996 deportation in violation of 8 U.S.C. § 1326(a)(2).

The district court dismissed the indictment as untimely under the five-year limitations period imposed by 18

U.S.C. § 3282. Citing this court's opinion in *United States v. Herrera-Ordones*, 190 F.3d 504 (7th Cir. 1999), the court applied a "constructive knowledge standard" to determine when the statute of limitations began to run. Although the indictment came less than two years after DHS learned from the fingerprint evidence that Are was in Chicago, the court concluded that DHS had constructive knowledge of Are's illegal presence in this country prior to September 1, 2000 (five years before the date of the indictment). The judge believed immigration authorities should have known of Are's presence well before that date based in part on an investigative file the INS opened on October 15, 1998.

It is not entirely clear what prompted the opening of this investigation; the file contains only a cryptic "Investigation Preliminary Worksheet" listing Are's name, a location of "CHI," and a checked box indicating the case was being "placed in progress." There is a separate document in the record indicating that on September 25, 1997, the INS received a tip from a confidential informant that Are was living in Chicago with his wife, Vivian Adelagun. In the district court, the government suggested the October 1998 investigative file was opened in response to the 1997 tip; in its brief in this court, however, the government maintains the file was opened in response to Are's failed reentry attempt in May 1998.

The district court also relied on two documents filed in 1998 in Are's drug case in the Eastern District of New York. On December 21, 1998, the probation office for the Eastern District of New York filed a Violation of Supervised Release form in Are's case. On December 29, 1998, an arrest warrant for the supervised release violation was issued. The violation report and warrant list a last known address for Are on Sheridan Road in Chicago (the same address listed in his presentence report in the underlying drug case), but there is no detail about the

nature of the violation; the government suggests the report and warrant were generated in response to Are's May 1998 failed reentry attempt.

Although the district court specifically declined to identify "a concrete discovery date," the court concluded that the foregoing evidence established that at some point prior to September 1, 2000, "the government had constructive knowledge of defendant's physical presence, identity as an illegal alien, and status as having a prior deportation." The court held that "[b]ecause a reasonable investigation would have discovered defendant prior to September 1, 2000, the indictment was filed five years after the section 1326 offense was committed, and the prosecution is therefore time-barred."

## II.  Discussion

The statute of limitations for noncapital offenses provides that "no person shall be prosecuted, tried, or punished for any offense . . . unless the indictment is found . . . within five years next after such offense shall have been committed." 18 U.S.C. 3282(a) (2000). Ordinarily, an offense is committed when it is completed, that is, when each element has occurred. *Toussie v. United States*, 397 U.S. 112, 115 (1970); *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999). The issue before us in this appeal is whether Are's charged offense—being "found in" the United States in violation of 8 U.S.C. § 1326(a)(2)—was committed within five years of September 1, 2005, the date of the indictment.

Both sides agree DHS did not actually discover Are in Chicago until late 2003 or 2004, well within the limitations period. But Are believes the limitations period was triggered in late 1998 because DHS should have discovered his illegal presence at that time. The government

counters that it had insufficient information to know Are was in Chicago in late 1998. Alternatively, the government contends that for the purposes of starting the limitations period, the offense of being "found in" the United States is completed only upon actual discovery of the deportee's physical presence by DHS. Constructive knowledge—the date on which the government "should have known" of the deportee's presence here—should not start the five-year clock.[1] We review de novo whether the limitations period has run, giving deference to necessary factual determinations by the district court. *United States v. Barnes*, 230 F.3d 311, 314 (7th Cir. 2000).

This circuit has yet to squarely address the issue of when the statute of limitations for a § 1326(a)(2) "found in" offense begins to run. *See United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 461 (7th Cir. 2006) (declining to consider whether a "one clock" rule should govern the running of the limitations period in "found in" cases). We

---

[1] The government believes it failed to raise this argument below and asks us to review the district court's application of a constructive knowledge standard for plain error. FED. R. CRIM. P. 52(b). The government concedes too much. Before the district court, the government took issue with Are's argument that it "should have known" of Are's illegal presence despite having no direct contact with him. In its response to Are's motion to dismiss, the government explained that "absent official contact with the government, however, there is simply no basis from which to establish that the government had knowledge of an alien's illegal entry." This preserved the issue for appeal because it alerted the district court and Are of the government's position that the immigration agency's actual knowledge—not constructive knowledge—of an alien's illegal presence is required to start the limitations period. Accordingly, our review of the district court's application of the constructive knowledge standard is plenary. *See United States v. Schlifer*, 403 F.3d 849, 853-54 (7th Cir. 2005).

have, however, characterized the "found in" offense under § 1326(a)(2) as a continuing offense, and this necessarily defeats Are's argument (adopted by the district court) that the limitations period begins to run when the government "should have found" him. In *United States v. Lopez-Flores*, 275 F.3d 661, 663 (7th Cir. 2001), we held that "in the case of surreptitious reentry . . . the 'found in' offense is first committed at the time of the reentry and continues to the time when [the defendant] is arrested for the offense." Treating the "found in" version of § 1326(a)(2) as a continuing offense "is a logical consequence of its language," which punishes any deportee who "enters, attempts to enter, or is *at any time found in*, the United States." *Rodriguez-Rodriguez*, 453 F.3d at 460 (emphasis added). "The point of using a word such as 'found' in § 1326(a)(2) is to avoid any need to prove where and when the alien entered; the offense follows the alien." *Id.*

Thus, we have held that for purposes of liability and venue, the "found in" crime does not occur "only at the instant of its detection." *Id.* "The crime is *being* in the United States and is not limited to the instant at which a federal agent lays hands on the person and a light bulb in the agent's head illuminates the mental sign 'This guy's an illegal alien.'" *Id. Lopez-Flores* held that the phrase "'found in' must have the force of 'present in' rather than 'discovered by the INS to be in.'" 275 F.3d at 663. Understood as a continuing offense, the date on which immigration authorities discover the violation "has no significance so far as culpability is concerned." *Id.*

We reached the same conclusion on the question of venue in § 1326 prosecutions in *Rodriguez-Rodriguez*. The applicable venue statute states that a prosecution may be brought "at any place in the United States at which the violation may occur or at which the person charged . . . may be apprehended." 8 U.S.C. § 1329. We said in

*Rodriguez-Rodriguez* that § 1329 "contemplates multiple lawful venues," and nothing in § 1329 or in § 1326 itself either "states or implies that an alien may be 'found' just once." 453 F.3d at 460. The defendant in *Rodriguez-Rodriguez* was a deportee who had been arrested in Texas for speeding and extradited to Wisconsin for failing to register as a sex offender following his release from a state sentence. *Id.* at 459. He was then indicted in the Western District of Wisconsin for being "found in" the United States after removal. He moved to dismiss, arguing improper venue. Conceding that immigration authorities did not actually know of his presence in this country until he reached Wisconsin, he contended they should have discovered his violation of § 1326(a)(2) when he was arrested in Texas. *Id.*

We rejected this argument, and in doing so substantially qualified certain language in *Herrera-Ordones*, on which the district court relied in this case. *Id.* at 461. In *Herrera-Ordones*, also a venue case, the defendant was arrested and convicted of battery in state court in Elkhart County, in the Northern District of Indiana, using the alias "Jose Rendon." 190 F.3d at 506. After sentencing, the Indiana Department of Corrections took custody of the defendant and transferred him to a prison reception center located in the Southern District of Indiana. *Id.* at 506-09. A few weeks later he was interviewed by an INS agent and admitted he had previously been deported; the INS then confirmed his true identity through fingerprint analysis. *Id.* at 509. He was indicted in the Southern District of Indiana for being found in the United States after deportation in violation of § 1326(a)(2). *Id.* at 507-08. He argued improper venue, taking the position that the INS should have known of his identity and status as a previously deported alien when he was in the Elkhart County Jail, in the Northern District of Indiana, because

the police knew that he used many aliases, including some formulations of "Herrera-Ordones." *Id.* at 510.

This court held in *Herrera-Ordones* that "an alien is 'found' within the meaning of § 1326 when the INS both discovers his presence in the United States and knows that, because of his identity and status, his presence here is illegal." *Id.* We rejected the defendant's constructive knowledge argument as a factual matter, holding that "the record demonstrates that the INS agents investigated Mr. Herrera-Ordones' identity and status with appropriate methodological diligence after learning of his presence in the Elkhart County Jail." *Id.* at 511. We also rejected the defendant's argument that venue was improper because he was in the Southern District involuntarily, by prison transfer; "whether an alien was in a particular location by choice has no relevance in venue determinations. Venue is proper anywhere in the United States, wherever the previously deported and reentered alien is 'found'" *Id.*

*Herrera-Ordones* must be read in light of our later opinions in *Lopez-Flores* and *Rodriguez-Rodriguez* construing the "found in" version of the § 1326(a)(2) offense as a continuing offense. As such, whether the immigration authorities exercised "appropriate diligence" in discovering the deportee's presence has no bearing on venue. *Rodriguez-Rodriguez* limited the holding of *Herrera-Ordones* as follows:

> *Herrera-Ordones* establishes that, when an alien frustrates earlier discovery of his identity and status, he is 'found' and may be prosecuted when federal agents at last stumble upon him in state prison; it does not hold (nor could it hold) that *only when* earlier discovery was impossible does actual discovery of an alien in state prison permit prosecution there. We now hold that venue may be laid wherever the alien is

located in fact, and as often as he is located, whether or not better coordination and diligence would have alerted federal officials to his presence and status earlier and elsewhere.

453 F.3d at 461 (emphasis in original). Similarly, *Lopez-Flores* established that because the "found in" offense is a continuing one, the precise date on which immigration authorities discover the deportee's illegal presence in this country is irrelevant to liability, although the opinion acknowledged that "it may bear on the running of the statute of limitations." 275 F.3d at 663.

Thus limited in light of these later developments in our case law, *Herrera-Ordones* does not support Are's argument (and the district court's assumption) that constructive knowledge—the date on which immigration authorities should have discovered the § 1326(a)(2) violation—triggers the statute of limitations. To be "found in" the United States without permission after deportation means to be "present in" the United States without permission after deportation; the immigration agency's "discovery" of the alien (whether actual *or* constructive) is not an element of the offense. We have held open the possibility that the date of *actual* discovery *might* have a bearing on the running of the statute of limitations. *Lopez-Flores*, 275 F.3d at 663. But because the "found in" version of § 1326(a)(2) is a continuing offense, the date on which the immigration agency "should have discovered" the alien is simply irrelevent.[2]

---

[2] Other circuits have adopted a variety of approaches to analyzing statute of limitations questions in "found in" cases under 8 U.S.C. § 1326(a)(2). The Second Circuit has held that the "found in" offense is not a continuing offense but adopted a "constructive discovery" rule for cases in which the deportee

(continued...)

This only makes sense given the straightforward language and manifest purpose of the statute. As we noted in *Rodriguez-Rodriguez*, a deportee who has reentered surreptitiously prolongs his illegal presence in the United States each day he goes undetected. 453 F.3d at 460. The limitations clock does not run during this period because the deportee's crime continues; he remains illegally "present in" the United States.

For other continuing offenses—conspiracy, escape, and failure to report to prison, for example—the limitations period does not begin to run until some affirmative event puts an end to the defendant's continuing criminal con-

---

[2] (...continued)
reenters by surreptitious border crossing or using fake documents at the border. *United States v. Rivera-Ventura*, 72 F.3d 277, 281-82 (2d Cir. 1995) (the "found in" offense is not a continuing offense but where deportee reenters by stealth the crime "is not complete until the authorities know, or with the exercise of diligence typical of law enforcement authorities could have discovered, the illegality of his presence"). The Third Circuit has held that the "found in" offense is not a continuing offense but adopted an "actual discovery" rule for cases in which there is no record of when the deportee reentered. *United States v. DiSantillo*, 615 F.2d 128, 137 (3d Cir. 1980) (if "the entry was surreptitious and not through an official port of entry, the alien is 'found' when his presence is first noted by the immigration authorities"). The Fifth, Eighth, and Eleventh Circuits, without addressing whether the offense is a continuing one, have held that "a previously deported alien is 'found in' the United States when his physical presence is discovered and noted by the immigration authorities, and the knowledge of the illegality of his presence, through the exercise of diligence typical of law enforcement authorities, can reasonably be attributed to the immigration authorities." *United States v. Santana-Castellano*, 74 F.3d 593, 598 (5th Cir. 1996); *see also United States v. Clarke*, 312 F.3d 1343, 1347-48 (11th Cir. 2002); *United States v. Gomez*, 38 F.3d 1031, 1037 (8th Cir. 1994).

duct. *See United States v. Elliott*, 467 F.3d 688, 690 (7th Cir. 2006). In conspiracies this is the date the defendant withdraws or is captured, and for escape and failure to report, it is the date the defendant turns himself in or is caught. *Id.* Applying a similar statute of limitations trigger to the § 1326(a)(2) "found in" offense would start the limitations period when the alien surrenders or is arrested. The government argues, however, for the earlier date of "actual discovery," that is, the date when immigration authorities acquire actual knowledge of the alien's physical presence, identity, and status as a prior deportee. We need not make a choice here, as both dates are well within the five-year statute of limitations.[3]

Immigration authorities learned of Are's presence in Chicago and ascertained his identity and status as a prior deportee sometime in late 2003 or 2004. Are's illegal presence in the United States continued until his arrest on June 20, 2005. The September 1, 2005 indictment was timely whether the limitations period commenced when immigration authorities actually "discovered" Are's presence, identity, and status or when they arrested him, interrupting his illegal conduct. Accordingly, we REVERSE the district court's order dismissing the indictment and REMAND the case for further proceedings.

---

[3] Other events, such as flight from justice, may toll the statute of limitations. *See* 18 U.S.C. § 3290.

No. 06-2802                                                                         13

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*