In the

# United States Court of Appeals

### For the Seventh Circuit

No. 15-1176

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

OSCAR F. ORONA-IBARRA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 14-CR-10050 — **Joe Billy McDade**, *Judge*.

ARGUED OCTOBER 28, 2015 — DECIDED AUGUST 3, 2016

Before WOOD, *Chief Judge*, and EASTERBROOK and
HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. It is a crime for a noncitizen who has
previously been removed to reenter the United States without
the permission of the Attorney General. 8 U.S.C. § 1326(a). A
person commits this crime in any location in the United States
where she is "found." *Id*. § 1326(a)(2). Another statute pro-
vides that venue in these cases is proper wherever in the

United States the violation may occur or where the accused person "may be apprehended." 8 U.S.C. § 1329.

Illegal re-entry is a "continuing offense" that is committed from the moment the defendant reenters the country until federal immigration agents gain actual (not just constructive) knowledge of her presence, her identity, and her unlawful immigration status. *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 461 (7th Cir. 2006). The violation occurs in any place where the defendant is located at the time federal immigration officials catch up with her, regardless of whether the defendant entered that district voluntarily. *United States v. Herrera-Ordones*, 190 F.3d 504, 509 (7th Cir. 1999).

Oscar Orona-Ibarra is a noncitizen who reentered the country after removal, in violation of section 1326. He was arrested on unrelated charges in Texas and was "found" by federal immigration officials while in custody in Texas. Federal officials then transferred him from Texas to the Central District of Illinois, where he ultimately was charged with violating section 1326. We hold that this district was not a permissible venue, because he did not commit any element of the crime there: he did not reenter the country in Illinois, he was not "found" in Illinois, and he was not "apprehended" in Illinois. We therefore reverse the district court's judgment and remand for further proceedings.

## I

The facts are uncontested. Orona-Ibarra is a citizen of Mexico who was living in the United States without proper authorization to do so. In 2006, federal agents in Illinois arrested him for attempting to deliver cocaine. On March 23, 2007, he pleaded guilty to possession of cocaine with intent to

distribute. The federal district court for the Central District of Illinois sentenced him to 54 months' imprisonment followed by four years of supervised release. On July 14, 2010, after serving his prison term, he was removed to Mexico. A condition of his supervised release was that he not return to the United States.

Orona-Ibarra chose to flout this requirement. He reentered the United States without a proper visa on October 10, 2012, near Hidalgo, Texas, which is in the Southern District of Texas. He did not stay below the radar for long: on April 23, 2013, Texas state officials arrested him for possessing marijuana. He pleaded guilty and the state court sentenced him to nine months' imprisonment. He was incarcerated at Pam Lyncher State Jail, which also is in the Southern District of Texas.

While he was in prison, federal officials from Immigration and Customs Enforcement (ICE), an agency of the U.S. Department of Homeland Security, discovered him and interviewed him on October 22, 2013. Orona-Ibarra admitted in a sworn statement that he had been removed in 2010, and that he unlawfully reentered the United States in 2012. Based on this information, ICE lodged a detainer with the Texas state authorities. See 8 C.F.R. § 287.7 (authorizing immigration detainers). The detainer stated that Orona-Ibarra was present in the United States in violation of 8 U.S.C. § 1326 and requested that the state transfer Orona-Ibarra to ICE custody once his Texas prison term was completed. (ICE seems to have been aware that Orona-Ibarra was back in the United States as early as April 2013, when he was arrested. The record includes an ICE detainer filed on April 22, 2013; it does not reflect how ICE learned of Orona-Ibarra's presence. We focus

on the October 22, 2013 interview and subsequent detainer because there is no dispute that ICE officials met with Orona-Ibarra in person and that Orona-Ibarra signed a sworn statement at that time. The difference in dates is irrelevant to our analysis.)

Shortly after ICE filed this detainer, Orona-Ibarra's federal probation officer in the Central District of Illinois became aware of his presence in the country. On November 21, 2013, that officer filed a petition to revoke Orona-Ibarra's supervised release based on the illegal reentry.

On January 16, 2014, Orona-Ibarra completed his Texas sentence. Rather than being released, he was immediately transferred into the custody of the U.S. Marshals Service, which delivered him to federal prison in Illinois to resolve the pending petition to revoke his supervised release. While Orona-Ibarra was in federal custody in Illinois, ICE re-lodged the same detainer, this time with federal officials in Illinois. On May 14, 2014, the district court for the Central District of Illinois sentenced Orona-Ibarra to time served for his supervised release violation and transferred him to ICE's custody.

A grand jury promptly charged Orona-Ibarra in the Central District of Illinois with unlawful reentry in violation of 8 U.S.C. § 1326. Orona-Ibarra moved to dismiss his indictment for improper venue. (He erroneously cited Federal Rule of Criminal Procedure 12(b)(2), which covers dismissals for lack of jurisdiction, rather than Rule 12(b)(3)(A)(i), the venue rule. We disregard this technical error.) The district court denied his motion. Orona-Ibarra then pleaded guilty to unlawful reentry, reserving his right to appeal the court's ruling on venue. On January 28, 2015, Orona-Ibarra was sentenced to 48

months in prison. He now appeals from the court's rejection of his venue challenge.

## II

For venue to be proper, "[t]he government must establish, by a preponderance of the evidence … that the offense occurred in the district in which it was brought." *Herrera-Ordones*, 190 F.3d at 509. Where the facts are contested, we review the evidence "in the light most favorable to the government" to determine if "the government proved by a preponderance of the evidence that the crimes occurred in the district charged." *Id*. (internal quotation marks omitted). In this case, the facts are uncontested; we have before us only a question of law, which we consider *de novo*. *United States v. Palumbo Bros.*, 145 F.3d 850, 860 (7th Cir. 1998).

## A

"The Constitution twice safeguards the defendant's venue right": in Article III and again in the Sixth Amendment. *United States v. Cabrales*, 524 U.S. 1, 6 (1998). Article III, Section 2, Clause 3, mandates that "Trial of all Crimes … shall be held in the State where the said Crimes shall have been committed[.]" U.S. CONST. art. III, § 2, cl. 3. The Sixth Amendment specifies that "the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]" *Id.* amend. VI. Federal Rule of Criminal Procedure 18 "echoes the constitutional commands," *Cabrales*, 524 U.S. at 6, by providing that "the government must prosecute an offense in a district where the offense was committed," FED. R. CRIM. P. 18.

As the Supreme Court has explained, "[q]uestions of venue in criminal cases … are not merely matters of formal

legal procedure. They raise deep issues of public policy in the light of which legislation must be construed." *United States v. Johnson*, 323 U.S. 273, 276 (1944). While the Supreme Court has not "set forth … a comprehensive discussion of the values protected by the constitutional venue provisions," it has identified some. *United States v. Muhammad*, 502 F.3d 646, 651 (7th Cir. 2007). These include "the protection of a defendant from prosecution in a place far from his home and the support system that is necessary to mount an adequate defense." *Id*. (citing *United States v. Cores*, 356 U.S. 405, 407, 410 (1958)). As Justice Story explained, the Constitution's venue provisions "secure a party accused from being dragged to a trial in some distant state … subjected to the verdict of mere strangers … who may … cherish animosities or prejudices against him." Joseph Story, *Commentaries on the Constitution* § 925 (Carolina Academic Press reprint 1987) (1833). Further, "a trial in a distant state" could result in "oppressive expenses" or "the inability of procuring proper witnesses to establish his innocence." *Id*.; see also *United States v. Palma-Ruedas*, 121 F.3d 841, 848 (3d Cir. 1997) (Alito, J., dissenting) (discussing Justice Story's *Commentaries*), *rev'd sub nom. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999).

Given the nature of the right, "there is no … mechanical test to determine constitutional venue. Rather, the test is best described as a substantial contacts rule that takes into account … the site of the defendant's acts, the elements and nature of the crime, the locus and effect of the criminal conduct, and the suitability of [the] district … for fact-finding." *Muhammad*, 502 F.3d at 652 (internal quotation marks omitted). These are real limitations: the Court has cautioned that "venue provisions in Acts of Congress should not be so freely construed as to give the Government the choice of 'a tribunal favorable' to it."

*Travis v. United States*, 364 U.S. 631, 634 (1961) (quoting *Johnson*, 323 U.S. at 276).

Many offenses touch more than one district. For these, Congress may, consistently with the Constitution, authorize venue in any district where conduct that is part of the offense occurred. See *Rodriguez-Moreno*, 526 U.S. at 279; *Cores*, 356 U.S. at 408; *Armour Packing Co. v. United States*, 209 U.S. 56, 76 (1908). This is reflected in 18 U.S.C. § 3237, which is the default venue statute. It states: "[e]xcept as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a).

To determine if Congress created a continuing or multi-district offense, courts consult the specific venue statute if there is one, and "'the nature of the crime alleged and the location of the act or acts constituting it.'" *Cores*, 356 U.S. at 407–08 (quoting *United States v. Anderson*, 328 U.S. 699, 703 (1946)). If Congress "is found to have created a continuing offense, 'the locality of (the) crime shall extend over the whole area through which the force propelled by an offender operates.'" *Id*. at 408 (alteration original) (quoting *Johnson*, 323 U.S. at 275).

Here, Congress created the crime of unlawful reentry after deportation (now removal), 8 U.S.C. § 1326, and enacted a specific venue provision for that crime, 8 U.S.C. § 1329. Any noncitizen who previously has been deported who "enters, attempts to enter, or is at any time found in, the United States" without the permission of the Attorney General commits a crime. 8 U.S.C. § 1326(a)(2). Venue for the prosecution is

proper "at any place in the United States at which the violation may occur or at which the person charged with a violation under section … 1326 of this title may be apprehended." *Id*. § 1329.

We have held that the language "at any time found in[] the United States" in section 1326 creates a continuing offense. *Rodriguez-Rodriguez*, 453 F.3d at 461. It follows that a defendant may be "found" in multiple locations, and venue will be proper in any of them. *Id*.; *Herrera-Ordones*, 190 F.3d at 511. (Other circuits take a different view. See, *e.g.*, *United States v. Hernandez*, 189 F.3d 785, 790 (9th Cir. 1999) (holding that defendant is "found" only in the first place apprehended).) A defendant is "found" for purposes of section 1326 when federal authorities actually discover her physical presence, her identity, and her status as a noncitizen who reentered in violation of section 1326—constructive knowledge is insufficient. *United States v. Are*, 498 F.3d 460, 465–66 (7th Cir. 2007); *Herrera-Ordones*, 190 F.3d at 510. We also use this definition of "found" to pinpoint when the statute of limitations begins to run for section 1326 violations. See *Are*, 498 F.3d at 462 (statute of limitations begins to run when immigration officials obtain actual knowledge of section 1326 violation); *Rodriguez-Rodriguez*, 453 F.3d at 461 (same); *United States v. Lopez-Flores*, 275 F.3d 661, 663 (7th Cir. 2001) ("The date of discovery … may bear on the running of the statute of limitations."); but see *United States v. Gordon*, 513 F.3d 659, 664 (7th Cir. 2008) (collecting cases from other circuits adopting contrary rules).

## B

There is no question that Orona-Ibarra was "found" in Texas on October 22, 2013. In his interview with ICE, he pro-

vided his real name, admitted that he previously had been removed, and that he reentered the United States in violation of section 1326. Since then, ICE has had actual knowledge of his presence in the country, his identity, and his illegal status. The immigration detainer filed in Texas shows as much. There is also no dispute that Orona-Ibarra has continuously been in custody from the time of his arrest in April 2013 until now: he was transferred from Texas state custody to federal custody, and then the U.S. Marshals delivered him to federal officials in Illinois. After he was sentenced to time served by the federal court in Illinois, he was transferred into ICE's custody, where he remains. This case therefore presents the question whether a defendant who was "found" by ICE in Texas, and has never left custody since then, can be "found" again in any state to which the federal authorities decide to move him. In particular, we must decide whether the fact that Orona-Ibarra was moved to Illinois by the Marshals to answer for his violation of supervised release (all the while under the ICE detainer), rather than directly by ICE for the immigration offense, makes a difference.

Our first stop is the text of sections 1326 and 1329. As we noted, section 1329 permits prosecutions to "be instituted at any place in the United States [1] at which the violation may occur or [2] at which the person charged with a violation" of section 1326 "may be apprehended." The place where the "violation may occur" is defined by section 1326: anywhere in the United States where the defendant "enters, attempts to enter, or is … found."

Of those possibilities, the only two relevant to this case are whether Orona-Ibarra was "apprehended" in the Central District of Illinois or whether his crime "occurred" there. (The

government does not argue that he either entered or attempted to enter through Central Illinois.) To "apprehend" someone is to arrest him for a crime. The term harks back to late Middle English, when the word "apprehend" meant to "grasp, get a hold of." NEW OXFORD AMERICAN DICTIONARY 77 (3d ed. 2010). Orona-Ibarra was not apprehended in the Central District of Illinois—he was transferred there, while in federal custody, after he wrapped up his legal problems in Texas. In order for venue to be proper in the Central District of Illinois, therefore, the crime must have "occurred" there.

Orona-Ibarra's crime "occurred" where he "enter[ed]" or "attempt[ed] to enter" the United States: in the Southern District of Texas. It also "occurred" in any place where he was "found"—that is, when federal authorities actually discovered his physical presence, identity, and immigration status. *Herrera-Ordones*, 190 F.3d at 510; *Are*, 498 F.3d at 465–66. There is no dispute that Orona-Ibarra was "found" in the Southern District of Texas. The question is whether he was "found" again (without being lost or free in the meantime) in the Central District of Illinois.

The government says yes: it interprets "found" to mean any place where one might lay eyes on the person, regardless of how she came to a district. But such an interpretation of sections 1326 and 1329 would read all limitations on venue out of the statute. It would be contrary to the "cardinal principle of statutory construction that a statute ought … to be so construed that … no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). We decline to read these words in a manner that runs so counter to ordinary rules of statutory interpretation.

A more modest version of the government's position would attach weight to the fact that it was the Marshals, not ICE, who moved Orona-Ibarra from Texas to Illinois. The Marshals took that step not for the purpose of facilitating a prosecution under 8 U.S.C. § 1326, but instead to force Orona-Ibarra to answer for his violations of his conditions of supervised release related to his drug conviction. One could then argue that Orona-Ibarra was not arrested for his 8 U.S.C. § 1326 violation until he reached Illinois, and was transferred to ICE custody.

Perhaps if the record showed that ICE had no knowledge of his presence in the country and only gained actual knowledge after Orona-Ibarra was back in Illinois, this point would have some force. But nothing of the kind occurred. ICE signified that it had "found" Orona-Ibarra when it lodged its detainer in the *Texas* court; that detainer was transferred to the Illinois court at roughly the same time as Orona-Ibarra was moved. This is not surprising, given the fact that ICE and the Department of Justice work closely together. ICE enters its detainers and administrative arrest warrants (both of which were issued for Orona-Ibarra) into the FBI's National Crime Information Center database. See ICE, *Law Enforcement Support Center*, www.ice.gov/lesc (last visited Aug. 3, 2016; 11:50 AM) (describing the ways in which ICE provides immigration information to other federal, state, and local law enforcement agencies). For Orona-Ibarra, the record demonstrates that ICE obtained the information necessary to determine his identity and unlawful immigration status through the FBI's databases, and, through its detainers, it kept a continuing "hold" on Orona-Ibarra from the time it discovered him in Texas until the immigration prosecution began. To use the statutory term, Orona-Ibarra was "found" in Texas, regardless of the offense

that led to his initial arrest, and that is what matters under 8 U.S.C. § 1326. Once ICE found him and kept him under continuous control through the detainer, it did not need to "re-find" him in Illinois when he was moved there.

This is enough, in our view, to hold ICE jointly responsible for Orona-Ibarra's move to Illinois, and to evaluate his venue claim on that basis. The dissent argues that because an ICE detainer does not compel local law enforcement to hold anyone in custody, see *Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014), we must consider Orona-Ibarra's move from Texas to Illinois as if it were freely made. But our decision does not rest on the belief that it was ICE that had Orona-Ibarra in custody from the time when he was "found" in Texas, or that ICE has the power to force either Texas or Illinois to hold him. The statutory term is "found," not "held." It is thus enough that Orona-Ibarra was actually "found" by ICE in Texas, and that he has been in custody (whether by ICE, or the Marshals, or by state authorities) since that time with ICE's full knowledge—in other words, that he was never "lost" by ICE such that he could be "found" again. Thus we have no disagreement with *Galarza*.

This position is consistent with holdings from our sister circuits. For instance, the rule in the Fifth Circuit is that "a previously deported alien is 'found in' the United States when his physical presence is discovered and noted by the immigration authorities, and the knowledge of the illegality of his presence, through the exercise of diligence typical of law enforcement authorities, can reasonably be attributed to the immigration authorities." *United States v. Ramirez-Salazar*, 819 F.3d 256, 258 (5th Cir. 2016). The Third Circuit has noted that the immigration authorities may "find" a person in a state

prison; it mentions nothing about an additional requirement of an arrest. See *United States v. Dixon*, 327 F.3d 257, 259 (3d Cir. 2003) (citing *United States v. Salazar-Robles*, 207 F.3d 648, 650 (9th Cir. 2000)). Once the alien is arrested for an immigration offense, all doubt is removed over the question whether he has been "found," but that is not the only way to demonstrate this fact. An immigration detainer from ICE can do the job just as well.

The constitutional directives expressed in Article III and the Sixth Amendment also inform our interpretation of the venue question Orona-Ibarra has presented. If we interpret section 1329 too broadly, then nothing would prevent the government from transporting an alien it found or apprehended to any of the 94 federal districts in the country and then charging him with illegal re-entry. The government might want to move all section 1326 prosecutions to a district known for friendly courts. Or it might wish to create a centralized processing and deportation center and prosecute all section 1326 violations there. Under its broader theory of section 1329, there is nothing to stop it from doing so.

Such a regime would raise grave constitutional concerns. This is precisely the scenario of "being dragged to a trial in a distant state" that the Constitution was designed to prevent. Story, *Commentaries*. How could the accused "mount an adequate defense," in a far-flung place where she has no witnesses or support system? *Muhammad*, 502 F.3d at 651. The pro-prosecution attitude the government might be shopping for may be one of the pre-existing "animosities or prejudices" that concerned Justice Story. Story, *Commentaries*. "[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the

other of which such questions are avoided, our duty is to adopt the latter." *Jones v. United States*, 529 U.S. 848, 857 (2000) (internal quotation marks omitted); see also *Bond v. United States*, 134 S. Ct. 2077, 2087 (2014) (employing constitutional avoidance). The well-established canon of constitutional avoidance supports our reluctance to interpret section 1329 as the government has urged.

Earlier decisions support the approach we have outlined. *United States v. Herrera-Ordones* addressed the question when federal officials have "found" a person within the meaning of section 1326. 190 F.3d at 504. In that case, Herrera-Ordones reentered the United States after being removed. *Id*. at 506. He was arrested by state officials in Elkhart, Indiana, which is in the Northern District of Indiana, for an unrelated crime. *Id*. When he was interviewed by federal immigration officials (from the legacy Immigration and Naturalization Service, or INS), he gave a false name and false social security number. *Id*. The ruse worked, briefly. Because of the false information, INS failed to find any files indicating that he had violated section 1326. *Id*. at 506–07. Herrera-Ordones was later transferred to a state facility in the Southern District of Indiana. *Id*. at 507. While in custody there, INS discovered his true identity and saw that he had violated section 1326. *Id*. INS then filed a detainer. *Id*. at 507–08. We held that venue was proper in the Southern District (rather than the Northern District, where he was first apprehended) because he was actually "found" in the Southern District. *Id*. The fact that he was transferred there involuntarily was of no moment: he had demonstrated sufficient *mens rea* to commit the crime by choosing to reenter the country. Whether he specifically intended to enter the Southern District of Indiana was irrelevant to whether he was properly "found" there. *Id*. at 511.

We also underscored the distinction between actual knowledge versus constructive knowledge of a section 1326 violation in *United States v. Rodriguez-Rodriguez*. 453 F.3d at 458. In that case, Rodriguez-Rodriguez had reentered the United States after removal, in violation of section 1326. *Id*. at 459. He was arrested by Texas state police for speeding. *Id*. Unlike Herrera-Ordones, Rodriguez-Rodriguez gave his real name and other identifying information. *Id*. at 460. He was then transferred to state custody in Wisconsin on an open warrant. *Id*. at 459. Wisconsin alerted federal officials to his identity and immigration status, and he was then charged with violating section 1326. *Id*.

He argued that he was "found" in Texas, not Wisconsin, because federal authorities *should have* discovered his presence when he was arrested in Texas. *Id*. Because he gave accurate identifying information, he continued, his case was distinguishable from *Herrera-Ordones*. We were not persuaded by this argument. Instead, we said, constructive knowledge is insufficient for a defendant to be "found" for the purposes of section 1326. *Id*. at 461. This does not preclude venue in multiple districts, in an appropriate case. To the contrary, we have acknowledged that "venue may be laid wherever the alien is located in fact, and as often as he is located, whether or not better coordination and diligence would have alerted federal officials to his presence and status earlier and elsewhere." *Id*. at 461.

Orona-Ibarra's situation is unlike either Herrera-Ordones's or Rodriguez-Rodriguez's. ICE actually "found" Orona-Ibarra in October 2013, when ICE officials gained actual knowledge of his presence, identity, and immigration status after interviewing him. Being "found" under section 1326

is a continuing offense. *Rodriguez-Rodriguez*, 453 F.3d at 461. But continuing offenses may end at some point. For the offense created by section 1326, that point is "when the defendant is arrested for the offense." *United States v. Lopez-Flores*, 275 F.3d at 663. In other words, the continuing offense stops when the defendant is "found" and in custody.

We recognize that because a defendant may be "found" repeatedly, see *Rodriguez-Rodriguez*, 453 F.3d at 460, a defendant who is released from custody could be "found" again. And a defendant in custody could be transferred to multiple locations, if she has not yet been "found" by federal immigration officials (for example, because they have not discovered her true identity or they are misled about her immigration status). But it makes no sense to say that the defendant's offense continues throughout her custody. It ends when the government has her in custody and the competent immigration agency knows both who she is and what her true immigration status is.

### III

Oscar Orona-Ibarra was in custody from the moment he was "found" by ICE in Texas through the moment he pleaded guilty in Illinois to violating section 1326. He has been in continuous custody (whether state or federal) since his release from the Texas prison. The federal government was intimately involved in controlling the manner of his custody from the time when ICE filed a detainer with Texas in 2013. Because Orona-Ibarra was "found" in Texas and then transferred by federal officials to Illinois, he committed no conduct element of the offense in Illinois nor was he apprehended there. Therefore we hold that venue in the Central District of Illinois is not proper under 8 U.S.C. § 1329.

We leave the question of relief to the district court on remand. Orona-Ibarra has sought dismissal of the indictment, but the Ninth Circuit in the similar case of *United States v. Hernandez* had before it a motion either to dismiss or in the alternative to transfer venue. 189 F.3d at 787. If there is no express request for transfer, as in this case, the question arises whether a defendant's motion under Federal Rule of Criminal Procedure 12(b)(3)(A)(i) implicitly includes a transfer request for purposes of Rule 21(b). That question has not been briefed before us, however, and so we express no view on the possibility of transfer rather than dismissal.

We end on a practical note. Our ruling should not impose any special hardship on the government. Because section 1326 is a continuing offense, should Orona-Ibarra be released in Illinois, unless he manages to leave the United States immediately, he may be rearrested and this time "found" in Illinois. (We offer no opinion on the question whether there is such a thing as a bad-faith release designed to last only minutes.) Alternatively, it is likely that the government can re-indict him in a proper district (such as the Southern District of Texas, where he was discovered and apprehended).

We REVERSE the district court's denial of Orona-Ibarra's motion to dismiss for improper venue, and REMAND for further proceedings consistent with this opinion.

EASTERBROOK, *Circuit Judge*, dissenting. An alien who reenters the United States after being removed may be prosecuted wherever that crime occurs, 8 U.S.C. §1329—which under 8 U.S.C. §1326(a)(2) means wherever he is "found." Orona-Ibarra was prosecuted in the Central District of Illinois, and in any normal usage he was "found" there. True, he had been found earlier in Texas (where he was in custody on state charges), but he was *also* found in Illinois. Because the crime is a continuing offense, an alien can be found more than once. *United States v. Rodriguez-Rodriguez*, 453 F.3d 458 (7th Cir. 2006). That's what happened to Orona-Ibarra.

My colleagues worry that reading "found" to mean "wherever the alien happens to be" would allow federal officials to cart an alien to whatever district they think is likely to impose the longest sentence. I agree with the majority that a person who is *continuously* in the custody of immigration officials is not subject to nationwide venue—though that's not what happened to Orona-Ibarra. Instead of worrying about what might happen to someone else, let's work through what actually happened to Orona-Ibarra.

Orona-Ibarra reentered the United States by stealth. He was arrested by Texas, for a state offense, and prosecuted in state court. Federal immigration officials lodged a detainer with Texas, but this detainer did not tell Texas what to do when Orona-Ibarra's nine-month sentence expired. It just asked for notice of his impending release. It said: "IT IS REQUESTED THAT YOU: … Notify this office of the time of release at least 30 days prior to release or as far in advance as possible." Indeed, federal regulations *define* immigration detainers as requests rather than commands. 8 C.F.R. §287.7(a)

("The detainer is a request that such agency [the one with custody] advise the Department [of Homeland Security], prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible."). See also *Arizona v. United States*, 132 S. Ct. 2492, 2507 (2012) (describing immigration detainers under 8 U.S.C. §1357(d) as requests); *Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014) (so holding).

The United States is a party to the Interstate Agreement on Detainers and might have tried to use it to compel Texas to surrender Orona-Ibarra for prosecution, but the United States did not invoke the Agreement—likely because Orona-Ibarra had not yet been charged with a federal crime, so his situation was outside the scope of Article IV(a), which applies only when "an untried indictment, information, or complaint is pending" against the person. Nor did a federal judge issue a writ of *habeas corpus ad prosequendum*, a command lying outside the Agreement. See *United States v. Mauro*, 436 U.S. 340 (1978).

The detainer, based as it was on immigration officials' knowledge that Orona-Ibarra had no right to be in the United States, meant that he had been "found" in Texas. But given the holding of *Rodriguez-Rodriguez*, that did not prevent him from being found again in another state.

To say that §1326 creates a continuing offense is not to say for how long the offense continues. We held in *United States v. Lopez-Flores*, 275 F.3d 661 (7th Cir. 2001), following decisions of at least four other circuits, that the offense ends once the alien has been arrested for the §1326 offense. That did not occur when Texas arrested Orona-Ibarra for a drug crime. Nor did it occur at the next step, when Texas turned Orona-Ibarra

over to the Marshals Service. It took him into custody because his illegal reentry and drug offense in Texas violated the conditions of his supervised release from an earlier sentence imposed by the Central District of Illinois following conviction for another drug crime. Once Orona-Ibarra was in Illinois, the district court revoked his supervised release and sentenced him to time served. Only then was he arrested and charged with the §1326 offense—and he was prosecuted in the only district where he was arrested for that crime. Putting *Rodriguez-Rodriguez* together with *Lopez-Flores* shows that venue in Illinois is proper.

My colleagues say that they accept the holdings of both *Rodriguez-Rodriguez* and *Lopez-Flores*, but their opinion has a different focus. *Lopez-Flores* tells us that the crime continues until arrest for the §1326 offense. Over the course of the majority opinion, arrest morphs into custody, and then custody morphs into control—so that if federal officials *control* an alien in District A, even when someone else has custody, the United States can't prosecute him in District B for a violation of §1326. Yet to say that X has control over Y is not to say that X has arrested Y *for a particular crime*, the issue that matters under *Lopez-Flores*. Anyway, I don't see how immigration officials *had* control of Orona-Ibarra before the revocation of his supervised release in Illinois. To repeat, an immigration detainer is nothing but a request to a coordinate sovereign for timely notice of an impending release. The majority's statement that immigration officials "kept [Orona-Ibarra] under continuous control through the detainer" (opinion at 12) treats an immigration detainer as something it isn't. If we treat an immigration detainer as what it purports to be (and what *Galarza* held it to be), it should not affect the permissible venue of a criminal prosecution.

But suppose we equate the detainer with custody. There remains the holding of *United States v. Herrera-Ordones*, 190 F.3d 504 (7th Cir. 1999). Herrera-Ordones was arrested in Northern Indiana, then moved by federal officials to Southern Indiana. We held that venue was proper in Southern Indiana because that's where the arrest *for the §1326 violation* occurred. (True, federal agents weren't sure that a §1326 prosecution was proper until Herrera-Ordones got to Southern Indiana, but the critical point is that the Southern District of Indiana was where the immigration arrest occurred.) So even on the assumption that Orona-Ibarra was in federal "custody" or "control" in Texas, he was not under arrest for the §1326 offense until he got to Illinois. He was therefore "found" in the Central District of Illinois, and venue was proper there.

Orona-Ibarra was present in Illinois because a district judge decided to enforce the supervised-release portion of an earlier sentence for a drug crime, not because the Executive Branch set out to manipulate venue for an immigration crime. A claim of manipulation would be more plausible if, after finally gaining custody of Orona-Ibarra in Illinois, immigration officials had hauled him back to Texas.